**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JAMES C. HILL, JR. AND KARI D. HILL, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF E.H., A.H., AND F.H.; MICHAEL ENGLISH AND ELLDWINIA ENGLISH, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF G.E., D.E., AND S.E.; SHANTE ENGLISH; STEPHEN ENGLISH; MICHAEL ENGLISH, JR.; EBONY STOVER, INDIVIDUALLY AND AS NEXT FRIEND OF J.S.; SEAN SKILLINGSTAD AND RESSIA SKILLINGSTAD, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF M.S. AND R.S.; RODOLFO CASTILLO AND LATASHA CASTILLO, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF R.C., E.C., J.C., I.C., AND T.C; BRADLEY OLIVER AND DEBORAH OLIVER, EACH INDIVIDUALLY AND AS NEXT FRIENDS OF J.O.; AND JAQUELINE OLIVER,     PLAINTIFFS, <br><br> V. <br><br> AETC II PRIVATIZED HOUSING, LLC; AETC II PROPERTY MANAGERS, LLC; AND HUNT ELP, LTD. D/B/A HUNT MILITARY COMMUNITIES,     DEFENDANTS | § § § § § § § § § § § § § § § § § § § § § § § § § § § | CASE NO. <u>5:20-CV-01473</u> |

---

**ORIGINAL COMPLAINT
AND DEMAND FOR JURY TRIAL**

---

Plaintiffs James C. Hill, Jr. and Kari D. Hill, each individually and as next friends of E.H., A.H., and F.H., minor children; Michael English and Elldwinia English, each individually and as next friends of G.E., D.E., and S.E., minor children; Shante English; Stephen English; Michael English, Jr.; Ebony Stover, individually and as next friend of J.S., minor child; Sean Skillingstad and Ressia Skillingstad, each individually and as next

friends of M.S. and R.S., minor children; Rodolfo Castillo and Latasha Castillo, each individually and as next friends of R.C., E.C., J.C., I.C., and T.C., minor children; Bradley Oliver and Deborah Oliver, each individually and as next friends of J.O.; and Jaqueline Oliver, bring this Original Complaint and Demand for Jury Trial against the Defendants listed above (the "Landlord Companies") and allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This lawsuit is brought by members of the United States Military (with their families) who leased military housing from the Landlord Companies at Randolph Air Force Base (the "Military Installation(s)").

2.      As further described below, the Landlord Companies are large, revenue-rich housing companies which were awarded contracts by the federal government to provide quality living arrangements for U.S. service members and their families.  They receive vast amounts of taxpayer revenue and turn massive profits in purporting to do so.

3.      Instead of providing satisfactory housing, the Landlord Companies have for many years concealed harmful housing conditions from unsuspecting military personnel and their families.  The personnel who lease the housing units effectively give up the full amount of their Basic Allowance for Housing ("BAH") only to be placed in housing replete with deplorable living conditions (including, without limitation, rainwater intrusion; leaking pipes; seeping sewage; excessive moisture; repulsive rodent and insect infestations; and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring and walls; faulty insulation; pervasive mold and other toxins; inescapable contamination due to the presence of asbestos and lead-based paint; deficient electrical, plumbing and HVAC systems; and other unacceptable departures from applicable building and housing

codes).  In the process, many such military personnel (and their spouses and children) suffer from resulting medical issues such as difficulty breathing, asthma, bronchitis, serious allergic reactions, nose bleeds, and gastrointestinal issues.  As they observe their families get sicker and sicker and realize the Landlord Companies take no action or grossly inadequate action, they suffer severe and ongoing mental anguish.

4.     When problems with the housing begin arising at points in time after move-in, the Landlord Companies ignore their residents' complaints or provide only token repairs to cover up the extent of the dilapidation.  Thus, the service personnel and their families find themselves in a time-consuming and taxing cycle in which they: (1) must wait on the Landlord Companies to slowly perform maintenance and repairs; (2) come to falsely believe the issues are resolved; and (3) then later discover the issues are not resolved.  All the while, the service personnel and their families suffer the consequences of their contaminated and appalling surroundings.

5.     The Landlord Companies routinely over-promise and under-deliver while benefitting from the fact that in many instances they falsely appear to act as if they are the Department of Defense or are under the immediate direction of the Department of Defense.  Thus, military personnel and their families trust the Landlord Companies, the Landlord Companies know it, and the Landlord Companies take full advantage by maximizing their profit to the detriment of the military families they have been entrusted by the government to properly care for.

6.     Plaintiffs (collectively referred to as "Servicemembers" or "Servicemember Plaintiffs") in this case assert various claims, including without limitation claims for breach of contract; third-party beneficiary of contract; breaches of the implied warranty of habitability and the implied warranty of good and workmanlike repairs; violations of section 92.051 *et seq.* of the Texas Property Code, the Texas Deceptive Trade Practices-

Consumer Protection Act ("DTPA"), and the federal Residential Lead-Based Paint Hazard Reduction Act; negligence and gross negligence; negligent misrepresentation; statutory fraud and common law fraud; unjust enrichment, restitution, money had & received; and claims for intentional nuisance, negligent nuisance, and strict liability nuisance.

7.      By this lawsuit, the Servicemembers seek to hold the Landlord Companies liable for their false promises, atrocious living conditions, personal injuries, and property damage caused by their profound neglect, malfeasance, and greed.

## THE PARTIES

8.      The Servicemember Plaintiffs are military families that have lived in or currently live in privatized housing at the Military Installation(s).

9.      Defendant AETC II Privatized Housing, LLC, is a foreign limited liability company that has appeared in this case and may be served through its counsel of record.

10.      Defendant AETC II Property Managers, LLC, is a foreign limited liability company that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

11.      Defendant Hunt ELP, Ltd., d/b/a Hunt Military Communities is a domestic limited partnership that may be served with process by serving its registered agent, Capitol Corporate Services, Inc., at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

12.      The Landlord Companies are each joint tortfeasors, agents of the others, joint venturers, and/or engaged in the joint enterprise of leasing military housing at the Military Installation(s), as well as the conduct and acts and/or omissions alleged herein. At all times relevant herein, there has existed a unity of interest and ownership among the Landlord Companies, their predecessors, agents, parents and/or subsidiaries, such

that any individuality and/or separateness among them has ceased, and each such entity is the alter ego of each other entity.

13.     The Landlord Companies are not persons acting under a federal officer.

## JURISDICTION AND VENUE

14.     The Servicemembers reallege the above paragraphs as if fully set forth herein.

15.     This Court has federal subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because some of the Servicemembers' claims arise under laws of the United States, and the Court therefore has ancillary jurisdiction over all of the state-law claims alleged herein.

16.     This Court also has jurisdiction over this proceeding pursuant to federal enclave subject-matter jurisdiction. Federal enclave jurisdiction is part of the Court's federal question jurisdiction under 28 U.S.C. § 1331. *See Paul v. United States*, 371 U.S. 245, 267 (1963); *Arlington Hotel Co. v. Fant*, 278 U.S. 439, 455 (1929); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Sparling v. Doyle*, No. EP-12-CV-323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).

17.     The events giving rise to Servicemembers' lawsuit occurred at the Military Installation(s).  Portions of the Military Installation(s) arguably qualify as a federal enclave over which the United States government exercises a degree of federal legislative jurisdiction.  *See* U.S. CONST., art. I, §8, cl. 17; *see also Kelly v. Lockheed Martin S'vcs. Group*, 25 F. Supp. 2d 1, 3 (D. Puerto Rico 1998).  Although the State of Texas retains concurrent jurisdiction over the Military Installation(s) as well, federal courts have subject-matter jurisdiction over controversies arising on federal enclaves.[1]  But the laws of the State of

---

[1] The laws of the State of Texas with respect to the housing units at issue are valid and enforceable at the Military Installation(s) at issue in this suit.

Texas with respect to the housing units at issue are valid and enforceable on the enclave and/or remaining portions of the Military Installation(s).

18.    In determining whether a claim arises on a federal enclave, courts have simply looked to see where "pertinent events" took place. *See Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1148 (S.D. Cal. 2007) (citing *Snow v. Bechtel Const. Inc.*, 647 F. Supp. 1514, 1521 (C.D. Ca1.1986)). This complaint makes it facially apparent that the pertinent events giving rise to the Servicemembers' claims arise out of their occupancy in housing properties controlled by the Landlord Companies on the Military Installation(s).

19.    This Court has supplemental jurisdiction for any state law claims under 28 U.S.C. § 1367.

20.    This Court has personal jurisdiction over the Landlord Companies because they have committed the acts complained of herein in this State and in this District.

21.    The Landlord Companies have significant contacts with the Western District of Texas such that they are subject to the personal jurisdiction of this Court.

22.    This Court has personal jurisdiction over the Landlord Companies for the additional reason that they have engaged in substantial, systematic and continuous contacts with this State by, *inter alia*, regularly conducting and soliciting business in this State and this District, deriving substantial revenue from services provided to persons in this State and this District.

23.    Venue in this proceeding is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Military Installation(s) where the housing at issue is located is within the geographical boundaries of the United States District Court for the Western District of Texas and, as such, a substantial part of the events and/or omissions giving rise to this claim occurred here.

## FACTUAL ALLEGATIONS

### The MHPI and the History of Privatized Military Housing

24.    In 1996, Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. *See* Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. § 2871 *et seq.* (1996). The MHPI provided military service branches with alternative authorities for construction, renovation and management of military housing for families and unaccompanied personnel. Under these authorities, the military services can leverage appropriated housing construction funds and government-owned assets to attract private capital and private developers so as to improve the quality of life for military members and their families. This legislation provided a way to maximize use of limited appropriated funds, land, and existing facilities to encourage private sector investment for the benefit of U.S. servicemembers.

25.    Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects." S. Rep. No. 104-112 (1995).

26.    The MHPI provides the Department of Defense ("DOD") with twelve alternative authorities or tools to achieve its purposes, which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances, investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

27.    There are about 80 privatized areas encompassing more than 204,000 housing units located on more than 150 installations. The DOD considers these housing units to be private housing.

28.    Servicemembers who lease housing on a particular military base are required to pay the privatized housing company the full amount of their BAH regardless of the size or condition of the house.  Before the MHPI, housing was provided to military personnel in lieu of the BAH. This change created continuous revenue flow for the life of the management contract and, at least conceptually, requires little additional funding from the government.

29.    The privatized housing companies collect "rent" in the form of BAH payments directly from the DOD, leaving servicemembers, including the Servicemembers named as Plaintiffs in this lawsuit, with no control over their BAH and no leverage against the Landlord Companies when problems arise with their homes. This disparity in bargaining power is further exacerbated by the fact that the Landlord Companies have a direct line of communication with the military and are keenly aware that a single call to the Servicemembers' chain of command will likely stifle any complaints about their housing. Consequently, the Landlord Companies often prey on Servicemembers' fears of reprisal even when conditions within the rental homes merit no BAH payment whatsoever.

30.    Privatizing U.S. military housing was supposed to *protect* soldiers and their families. The military knew hazards lurked in its housing, and the Landlord Companies likewise were aware of the problems when they took over.  In 2005, for example, the U.S. Army released an environmental study showing 75% of its 90,000 homes nationwide did not meet its own standards of quality or safety. Twenty years after privatization, in 2016, a DOD Inspector General Report found that poor maintenance and oversight left military families vulnerable to "pervasive" health and safety hazards.

### Rampant Abuses of the MHPI

31.     Beginning in 2018, Reuters published a series of news articles detailing substandard living conditions at U.S. military bases around the country, including lead exposure, vermin infestation, mold and other contaminants. The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

32.     In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.

33.     On December 3, 2019, a hearing was held before the United States Senate's Armed Services Committee. At the outset of the hearing, Senator Jim Inhofe stated as follows:

> Almost a year ago, **I first heard from military families about the dismal conditions they faced**.  Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base.  And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no.  It is elsewhere in Oklahoma.  But then it is also **all the way around the country**.  And so that was the background of how this all started.

> We have come to learn that **it is a problem nationwide**.  It is **a national crisis** of proportions we have not seen since the scandal at Walter Reed about a decade ago.

See STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).[2]

34.     Senator Inhofe further added:

> We continue to hear regularly from the **families across the country** about questionable practices, poor workmanship, and frankly, in some places about **housing contractors just not caring** about the families they are supposed to be serving.

---

[2] Inhofe's statement can be viewed at https://www.inhofe.senate.gov/newsroom/press-releases/icymi-inhofe-delivers-opening-remarks-at-privatized-military-housing-hearing.

Additionally, as reported in the press, some of these contractors are now under investigation for **defrauding the Federal Government**. I am really worried. What else can come out of the woodwork on this? What else don't we know?

. . . .

Regardless of any potential criminal wrongdoing, we are still **receiving complaints on a daily basis** showing that you are still failing to fix this problem.

*Id.* (emphasis added).

35.    During the same Senate hearing, Elizabeth A. Field, a Director with the Government Accountability Office, testified:

We analyzed over 8 million work order records from all 14 private partners and all 79 projects . . . . we found **anomalies in the data provided by all 14 private partners** such as duplicate work orders and work orders with completion dates prior to when they were submitted.

*See* Testimony Before Senate Armed Services Committee at 14:10-14:20 (emphasis added).[3]

36.    Field then added:

**The problems I detail are significant** . . . . because the Department has been using these metrics to reward and incentivize the private partners.

*See id.* (emphasis added).

37.    Private military housing companies, including the Landlord Companies in this case, upon information and belief manipulated service and repair records to the detriment of residents to drive up profits, including "incentive fees," that could be collected as part of its contract with the government.

38.    On February 6, 2019, Senator Elizabeth Warren opened her own investigation of the MHPI and private military housing landlord companies operating

---

[3] Ms. Fields' testimony is available at https://www.c-span.org/video/?466935-1/privatized-military-housing.

thereunder.  In Senate testimony on February 13, 2019, John Ehle, President of Hunt Military Communities, acknowledged Defendants and/or related entities are responsible for the maintenance of the military housing on applicable bases and effectively admitted under oath that they have not met their obligations to ensure the military housing under their charge are safe, clean and habitable.  *See, e.g.,* TESTIMONY BEFORE JOINT SUBCOMMITTEE ON PERSONNEL & READINESS AND MANAGEMENT SUPPORT at 2:21:20-2:21:26.[4]  The leaders of other housing entities operating under the MHPI echoed the same with respect to their standards and procedures and, as a result, amplified widespread concern about a culture of systemic abuse that appears to be rampant throughout the housing companies operating under the MHPI (including the Landlord Companies named as Defendants herein).  *See id.*

39.     The Landlord Companies were tasked with providing quality military housing to U.S. military personnel and their families but, upon information and belief, have operated duplicitously so as to avoid doing so and thereby decrease costs while increasing profits at the expense of U.S. soldiers, their families and children, and the United States taxpayer.

40.     Senator Warren submitted her written report, dated April 30, 2019, which contained four conclusions about the various private housing firms operating under the MHPI, including the Landlord Companies named as Defendants herein: (1) they have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds; (2) they have failed to create accessible or centralized

---

[4] The hearing testimony is available at https://www.armed-services.senate.gov/hearings/19-02-13-current-condition-of-the-military-housing-privatization-initiative.

records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality; (3) they are making large profits while taking minimal investment risks; and (4) they are receiving sizeable incentive fees even when they face substantial quality control challenges. *See* REPORT OF INVESTIGATION INTO MHPI, Apr. 30, 2019.[5]

41.     Since having ownership of the subject housing units at the Military Installation(s) transferred to them and being delegated maintenance responsibility for the same, the Landlord Companies have systematically undermaintained the units, subjecting the Servicemembers and their families to the above-described atrocious conditions.

42.     In their dealings with the Servicemembers, but for the admissions and acknowledgements in their congressional testimony, the Landlord Companies refuse to acknowledge the severity of the problems and refuse to adequately remedy them, instead moving families again and again and again to new units they assure the Servicemembers are just fine.

43.     As a result, the Servicemembers and their families have fallen ill due to exposure to the mold and other toxins, lost nearly all their personal possessions (some as a result of living in multiple units with environmental issues), and paid their full BAH in exchange for woefully substandard facilities.

**The Servicemembers and Their Families Have Suffered Tremendously**

**JAMES C. HILL, JR. AND KARI D. HILL**

---

[5] Senator Warren's report is available at https://www.warren.senate.gov/imo/media/doc/2019.04.30%20Military%20Housing%20Letter%20to%20Armed%20Services%20Branch%20Chiefs.pdf.

44.     James C. Hill, Jr., his wife, Kari D. Hill, and their three children moved to Hunt-managed on-base housing at RAFB in February 2017.  The dilapidated, unhealthy, and destructive conditions they encountered their first day there continued to plague them until the day the family left.

45.     The Hill family moved into the house located at 3 Northeast Road, Universal City, Texas 78148 on February 17, 2017, and moved out on May 17, 2020. During the three years the Hill family lived in that home, they experienced issues related to water damage, mold growth, structural deficiencies, lead paint, and rodent infestations.  Specifically, lead paint chipped off the walls, the home was riddled with wood rot, inadequate ventilation, and water damage throughout the home.

46.     Within months of moving into the house, the entire family began suffering from health effects caused by these poor housing conditions. James Hill began suffering from excessive allergies and nosebleeds.   Kari Hill experienced headaches, gastrointestinal issues, fatigue, insomnia, tenderness, congestion, excessive eye secretions, anxiety, and a dry cough, and in 2018, while still residing in the home, she was diagnosed with fibromyalgia.  The Hills' children also experienced significant health problems while living in the home: A.H. experienced anxiety and depression requiring medication; E.H. experienced excessive joint pain and aches; and F.H. developed ADHD.

47.     As a result of the squalid conditions in which the Hill family was forced to live, multiple types of testing were performed on both the home and the Hill family's belongings in January 2020.  The results of that testing showed water damage and higher than normal mold spore counts throughout the home.  The consultants who tested the Hill family's home recommended a multitude of repairs and remediation, including remediation of the family's household goods ("HHGs").

48.     In April 2020, the Hill Family notified Hunt that James Hill would be retiring from the Air Force and provided notice to vacate the Northeast Road property under the terms of their lease.  The family vacated the property on Northeast Road in May 2020.  However, due to the results of testing of their HHGs, the Hill family was informed that they should not take their contaminated belongings with them.  As a result, the Hill family was forced to put all of their belongings in a storage unit at the time they vacated the property; their belongings remain in storage to this day.

49.     As a result of living in a Hunt-managed house at RAFB for three years, the Hill family will likely permanently lose many of their personal possessions and will continue to suffer health issues associated with exposure to mold and other airborne toxins. The deplorable conditions also caused them to suffer mental distress from living in an unhealthy environment, worrying about their children, and a dealing with a derelict landlord that consistently failed to address issues that materially affected their health and safety.  And the Hill family paid handsomely for the privilege, paying their monthly BAH to Hunt 38 times to remain living in this squalor.

## MICHAEL ENGLISH AND ELLDWINIA ENGLISH

50.     Michael English, his wife, Elldwinia English, and their seven children and one grandchild moved to Hunt-managed on-base housing at RAFB in January 2018. The unhealthy and unlivable conditions they encountered their first day continued to plague them until the day the family left.

51.     The English family moved into the house located at 11 Outer Octagon, Universal City, Texas 78148 on January 1, 208, and moved out on January 1, 2019. During the one year the English family lived in that home, they experienced issues related to mold, asbestos, water damage, sewage intrusion, lead paint, structural and flooring

issues, and rodent and bug infestations. Specifically, a hole in the floor made it impossible for the English family to regulate the home's temperature, resulting in high electricity bills each month.

52.     Upon moving into the home at RAFB, the family was healthy, however in a short period of time, the family's health began to deteriorate. Elldwinia English was always sick while living in the home. She had difficulty breathing and her allergies were always really bad, resulting in her being in an out of the hospital. These breathing issues have continued to this day, despite not living in the home. The English family's children also experienced significant health issues. Their son suffered from asthma attacks and had to use his asthma pump regularly. The family's four adult children and three younger children were all living in the home and suffered from respiratory issues. The newborn living in the home also suffered a lot of medical conditions. Prior to moving into the home Michael English was very healthy, however while living in the home he was placed on a Z-Pak, had a mild stroke, and was constantly sick.

53.     As a result of living in a Hunt-Managed house at RAFB for a year, the English family will likely continue to suffer health issues associated with exposure to mold and other airborne toxins. The deplorable conditions in the home also caused them to suffer mental distress from living in an unhealthy environment, worrying about their family's health, dealing with a landlord that consistently failed to address issues that materially affected their health and safety, and anxiety over how to escape their house without disrupting their lives or incurring tremendous costs from moving, personal property replacement, and off-base housing.  The Skillingstad family has sustained economic damages consisting of their basic allowance for housing, repair bills, medical bills, and damage to personal property.

## SEAN SKILLINGSTAD AND RESSIA SKILLINGSTAD

54.     Sean Skillingstad, his wife, Ressia Skillingstad, and their two children moved to Hunt-managed on-base housing at RAFB in September 2017. The unhealthy and unlivable conditions they encountered their first day continued to plague them until the day the family left.

55.     The Skillingstad family moved into the house located at 4 Outer Octagon, Universal City, Texas 78148 on September 20, 2017, and moved out on June 12, 2020. During their nearly three years the Skillingstad family lived in that home, they experienced issues related to water damage, sewage issues, mold growth, structural deficiencies, lead paint, and rodent and insect infestations.

56.     Prior to moving into the home, Ressia Skillingstad suffered from an autoimmune and rheumatological dysfunction. The correlation of Mrs. Skillingstad's pre-existing conditions and the mold exposure in the home resulted in her worsening health problems. The Skillingstad's son was diagnosed with asthma as a result of his exposure to the mold in the home at RAFB.

57.     As a result of living in a Hunt-Managed house at RAFB for several years, the Skillingstad family will likely continue to suffer health issues associated with exposure to mold and other airborne toxins. The conditions in the home also caused them to suffer mental distress from living in an unhealthy environment, worrying about their family's health, dealing with a landlord that consistently failed to address issues that materially affected their health and safety, and anxiety over how to escape their house without disrupting their lives or incurring tremendous costs from moving, personal property replacement, and off-base housing.  The Skillingstad family has sustained

economic damages consisting of their basic allowance for housing, repair bills, medical bills, and damage to personal property.

### RODOLFO CASTILLO AND LATASHA CASTILLO

58.    Rodolfo Castillo, his wife Latasha Castillo, and their five minor children and minor nephew moved into the Hunt-managed property located at 5B 2nd Street East, Universal City, Texas 78148 on November 17, 2016, and they moved out on November 17, 2017.  During their time in the property, the Castillo family faced mold contamination, an extreme cockroach infestation, structural issues, plumbing leaks, faulty appliances, and a faulty HVAC system.

59.    The mold in the Castillo's home was so bad that the family was displaced from their home for repairs twice. Unfortunately, Hunt's solution was merely painting over the mold rather than performing proper remediation.  The house had structural issues that caused the stairs to become unattached from the wall and the ground, and there were nails protruding from the stairs in multiple areas.  The issues with the stairs caused Mrs. Castillo to fall down the stairs at one point in time. The home was infested with cockroaches to such an extent that the family was not comfortable unpacking all of their belongings.   Cockroaches infested their couches and destroyed their other belongings. They did not trust that the food in their home was not tainted by cockroaches, which required eating outside of their home for most of their meals.  The plumbing in the home frequently leaked, and the family was left without hot water for nearly a week.  The HVAC system never functioned properly, they were frequently left without heat, and the filters of the HVAC system filled with mold on a weekly basis.

60.    As a result of the living conditions described above, Mrs. Castillo experienced sleep deprivation, stomach issues, headaches, and loss of hair due to stress.

Their children, J.C. and E.C., were catching an unusual amount of colds and viruses after moving into the home. Their oldest son, R.C., suffered from nose bleeds and extreme allergies. In addition, the Castillo's nephew, T.C., and oldest son, R.C., developed Pityriasus rosea while in the home. The Castillos were a healthy family prior to being exposed to the mold, lead paint, poor ventilation, and roach infestation inside the home at Randolph Air Force Base. As a result of the conditions in their home, my clients had to pay for medical bills concerning worsened health issues, breathing complications, and being constantly sick.

61.     As a result of the conditions in their home, the Castillo family has sustained economic damages consisting of their basic allowance for housing, repair bills, medical bills, and damage to personal property. The Castillo family will likely continue to suffer health issues associated with exposure to mold and other airborne toxins at the Hunt-managed property. Additionally, the family suffered mental anguage as a result of Hunt placing them in an uninhabitable house that made them sick. The conditions in the home also caused them to suffer mental distress from living in an unhealthy environment, worrying about their family's health, dealing with a landlord that consistently failed to address issues that materially affected their health and safety, and anxiety over how to escape their house without disrupting their lives or incurring tremendous costs from moving, personal property replacement, and off-base housing.

## BRADLEY OLIVER AND DEBORAH OLIVER

62.     Bradley Oliver, his wife Deborah Oliver, their daughter Jaqueline Oliver, and their minor son J.O., moved into the Hunt-managed property located at 9 Southwest Drive, Universal City, Texas 78148 on August 15, 2017, and they moved out on April 12, 2019. The Oliver family experienced a litany of issues with their Hunt-managed housing, including mold, water damage,

poor ventilation, filthy HVAC ductwork, structural issues, and rodent infestation.  When the family notified Hunt of the mold issues, maintenance stated the issue was mildew and not mold, and merely wiped the area instead of properly remediating the area.  Hunt failed to address the excessive moisture in the home and the rodent infestation for the entire duration of the family's tenancy.

63.    Mrs. Oliver experienced chronic migraines, fatigue, cognitive fog, shortness of breath, difficulty breathing, anxiety, depression, and chest pain while living in the house and still experiences those symptoms. Mrs. Oliver's hip and knee pain were greatly exacerbated by living in the home.  She began having a difficult time completing basic chores, and was affected emotionally.  Shortly after vacating the Hunt-managed home, Mrs. Oliver was diagnosed with COPD and Mixed Connective Tissue Disease.  Mrs. Oliver's symptoms required several trips to the emergency room and she is currently treated by a pulmonologist, rheumatologist, cardiologist, neurologist, psychiatrist, and therapist.  She must take multiple medications to prevent lung damage.  Mrs. Oliver's health has deteriorated to such an extent that she had to leave her job and has been unable to return to work.  In addition, Jonathan Oliver's reactive airway disease was exacerbated by the environmental factors present in the home.

64.    As a result of the conditions in their home, the Oliver family has sustained economic damages consisting of their basic allowance for housing, repair bills, medical bills, and damage to personal property. They will continue to incur medical bills in the future as the medical conditions caused by the Hunt-managed housing continue to plague the family.  Additionally, the family suffered mental anguage as a result of Hunt placing them in an uninhabitable house that made them sick.  They suffered from concerns of their family's safety, and anxiety over how to escape their house without disrupting their lives or incurring tremendous costs from moving, personal property replacement, and off-base housing.

<u>**THE COMMON THEME**</u>

65.     With respect to all of these families, on the day each family first saw and leased their respective house from Hunt, Hunt's representatives, including Ms. Froom, Ms. Estrada, and Ms. Hefford, Ms. Williams, told the families that the house being leased to them was safe for them to occupy and had no unresolved issues.  These communications occurred at the Hunt housing office on Randolph.  Thereafter, throughout their time in the houses, whenever a family would call in, email in, or otherwise submit a work order, Hunt's representatives, including the aforementioned persons as well as the maintenance personnel, including Mr. Faircloth, Mr. Harris, and Mr. Knight, would tell the families – either at the house or at the housing office – that all work necessary to resolve the issue had been performed.  These representations were demonstrably false, as the issues complained of continued to persist throughout each family's occupancy of the house leased to them, and as further investigation has revealed that the houses had long-standing maintenance issues.  The names, dates, and issues that are the subject of the false representations are documented in the work order history maintained by Defendants.

<u>**The Underlying Contracts, Military Services' Standards, and Servicemember Leases**</u>

66.     Congress designed the MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities in return for their provision of housing and related services to military personnel.  *See* 141 Cong. Rec. S18853 (noting the MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel.").

67.     According to the website for the Office of the Assistant Secretary of Defense for Sustainment, Congress established the MHPI "as a tool to help the military improve the quality of life for its servicemembers by improving the condition of their housing."[6]

68.     After the MHPI was enacted into law, the United States of America—to accomplish its admirable goals related to the improvement and management of military housing—entered into a ground lease and various other contracts (the "Underlying Contracts") binding the Landlord Companies for the design, development, management, operation, maintenance, renovation and rehabilitation of housing units for military personnel and their families at the Military Installation(s).[7]

69.     Accordingly, military personnel such as the Servicemember Plaintiffs in this lawsuit were intended beneficiaries of the MHPI and the Underlying Contracts which served as the primary vehicle for implementation of the MHPI.  The MHPI and the Underlying Contracts were created for the express purpose of improving military housing for military personnel and their families including the Servicemember Plaintiffs in this lawsuit.

70.     As a result of the Underlying Contracts binding the lessee signatories and their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like, the Landlord Companies placed themselves in such a relationship with the Servicemembers that the law imposes an obligation upon the Landlord Companies to act in such a way that the Servicemember Plaintiffs in this lawsuit would not be injured as a result of leasing the privatized housing units.

---

[6] *See* Office of the Assistant Secretary of Defense for Sustainment, Facilities Management–Military Housing Privatization Initiative, *available at* https://www.acq.osd.mil/eie/FIM/Housing/Housing_index.html.
[7] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

71.     The Underlying Contracts require compliance with applicable state laws. As revealed by congressional testimony in December of 2019 by Elizabeth A. Field, a Director with the Government Accountability Office, the Landlord Companies must "comply with all federal, state, and local environmental health and safety codes. . . . [T]hat requirement is in all of the contracts."[8]

72.     Moreover, the Underlying Contracts, upon information and belief, require management and maintenance of the military housing consistent with the standards of a market rate residential rental development in the surrounding area.  This is to include maintenance and repair in accordance with military, federal, state and local codes to ensure all of the houses are at all times maintained in a reasonably acceptable fashion.

73.     In addition, all new construction and major renovations at military housing projects must be completed in accordance with local building codes and standards.

74.     And the military services have adopted their own standards applying to the condition and maintenance of privatized housing.  Compliance with the standards is generally mandatory.

75.     For example, Army Pamphlet 420-1-1 identifies standards intended to maintain housing to prevent its deterioration including, without limitation, as follows: roofing is required to be weather-tight and free of corrosion and abnormal deterioration of individual components, and replacement is required for missing pieces to preserve the original whole condition of the roof system; items which pierce the roofing must function as originally designed; flashing must prevent leaks as originally intended; interior walls must be free of damage, deterioration, cracks or defective materials; subflooring and

---

[8] *See* Transcript of December 3, 2019 Hearing Before the Committee on Armed Services of the United States Senate, *available at* https://www.armed-services.senate.gov/imo/media/doc/19-77_12-03-19.pdf, at p. 89:7-10.

related structural members must be safe and usable; deteriorated subflooring must be repaired or replaced to retain the original condition of the floor; and interior trim must be smooth and free of chipped and peeling paint.[9]

76. Similarly, pursuant to the Air Force Guidance Memorandum AFI32-6001, maintenance and repair must be performed according to accepted engineering practices and repairs to defective, broken, damaged or malfunctioning conditions must be performed timely and adequately, including without limitation interior painting; minor floor and wall repairs; restoring ceiling and wall finishes; electrical and plumbing fixture repairs; restoration or replacement of flooring and roofing systems as needed; repair of exterior walls and structures; repair of interior partitions; repair of electrical, plumbing, heating ventilations and air conditioning; and replacing failed or unserviceable materials, systems or components.[10] Under the U.S. Air Force Family Housing Guide for Planning, Programming, Design and Construction, lead-based paint must be abated and indoor air pollutants such as mold, asbestos and harmful allergens must be eliminated.[11]

77. Moreover, the Underlying Contracts, upon information and belief, require the Landlord Companies to manage lead-based paint in accordance with standards set by the military services, and an environmental baseline survey must be prepared before any real property can be sold, leased, transferred or acquired so as to establish a baseline of the environmental condition of the housing and serve as a basis for identifying areas that may be contaminated. The survey, upon information and belief, includes a lead-based paint survey indicating the presence of lead-based paint in the housing units

---

[9] *See* ARMY PAMPHLET 420-1-1, pp. 49-51, *available at* https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/PAM%20420-1-1.pdf.

[10] *See* AIR FORCE GUIDANCE MEMORANDUM AFI32-6001, pp. 57-58, *available at* https://www.wbdg.org/FFC/AF/AFI/afi_32_6001.pdf.

[11] *See* U.S. AIR FORCE FAMILY HOUSING GUIDE FOR PLANNING, PROGRAMMING, DESIGN AND CONSTRUCTION, pp. 211-14, *available at* https://www.wbdg.org/FFC/AF/AFDG/familyhousing.pdf.

constructed prior to 1978, and in some instances in the soil surrounding the units which exceeds regulations set by the Environmental Protection Agency ("EPA").  Pursuant to EPA regulations, a soil-lead hazard is present on residential property when concentrations in the soil exceed 400 parts per million in high contact areas for children or 1,200 parts per million of bare soil in the rest of the yard.  And, according to the baseline survey, lead-based paint exists throughout the housing units including without limitation door frames, window sills, window jambs, and baseboards.  Accordingly, the Landlord Companies possessed records and information, upon information and belief, including the aforementioned environmental survey which identified concerning lead concentrations in the soil surrounding the housing units as well as in the lead-based paint present in the housing units, but did not disclose such information to all tenants as required and have failed to remedy the conditions, thereby exposing the Servicemembers and their families thereto.

78.    Upon information and belief, the Landlord Companies knew about the unacceptable conditions in the housing when they agreed in the Underlying Contracts to manage the housing and ensure it was made habitable and acceptable for military members and their families to live in the houses.  Moreover, upon information and belief, the Landlord Companies agreed they would not permit occupancy or use of any buildings, including those leased by the Servicemembers, without complying with all applicable federal, state, and local laws and regulations pertaining to lead-based paint and lead based paint hazards.

79.    The Landlord Companies require Servicemembers to enter into a lease agreement.  Under the terms of the lease, Servicemembers' rent is the full BAH, which is deposited directly into the Landlord Companies' accounts. Despite the deplorable

conditions described herein, there is no ability for Servicemembers to negotiate the price of the housing.

80.     For a Servicemember moving to a new base upon receiving orders to do so, the main priority is to start the new assignment as expeditiously as possible. This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training. And for servicemembers relocating across the country or from overseas, there is often little or no time to meaningfully review housing options at the new duty station before arriving on base.

81.     To this point, Senator Tim Kaine remarked on December 3, 2019, during the hearing before the United States Senate's Armed Services Committee:

> But **they treat military tenants like they are captives**, like it is a captive audience.  People who move from across the country to a place where they do not know anyone, where they do not know anything about the rental market, where they are trying to find new schools and get accustomed to everything else – there is a natural tendency to want to live on base.  And the occupancy rates will be high because of that tendency.  And **so these companies who would compete hard and try to produce a high quality product in another business** unit of the identical company **treat these folks as if they are captives** and that they do not have to treat them in the same way that they would treat private tenants.  And I find that outrageous.

*See* STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).

82.     The lease is made subject to the laws of the State of Texas, and the Landlord Companies provide Servicemembers with resident guide(s) incorporated into the lease which upon information and belief convey rules and regulations subject to the laws of the State of Texas.

83.     The Landlord Companies have, upon information and belief, received thousands of complaints and repair requests, including those from the Servicemembers named as Plaintiffs herein, evidencing serious defects which exist throughout the

housing units.  The Landlord Companies had actual notice of the unfit and uninhabitable state of leased premises but failed to adequately make repairs.

84.     Instead, upon information and belief, the Landlord Companies made representations to Servicemembers in connection with the lease, including that the houses were structurally sound, had no potential health or safety hazards to residents, and were compatible with contemporary standards of livability. Moreover, upon information and belief, the Landlord Companies advertised that current renovations are compliant with current housing and building codes.   Specifically, the Landlord Companies advertised to the Servicemembers that: "Randolph Family Housing offers the quality living your family deserves…" and "Randolph Family Housing is managed by Hunt Companies, a national real estate services leader that has been providing Service Members and their families with expertly designed homes, fully developed communities, and exceptional management services, for over 40 years."[12] Additionally, the Landlord Companies represented via the community website that the community had been "[u]ndergoing renovations since 2007,"which led the Hill family to believe that they were renting a recently renovated home that was safe for their family and not harmful to their health.[13]

85.     Nevertheless, the fact remains that the Servicemembers' experiences run overwhelmingly contrary to the Landlord Companies' false representations.

---

[12] Randolph Family Housing website as of December 3, 2016,
https://web.archive.org/web/20161203004544/http://www.randolphfamilyhousing.com/.
[13] Randolph Family Housing website as of November 6, 2018,
https://web.archive.org/web/20181106221713/http://www.randolphfamilyhousing.com/find-a-home/features-amenities/housing-amenities.

**CAUSES OF ACTION**

86.    The Servicemembers reallege and incorporate by reference the foregoing paragraphs as though fully stated herein.

**Count 1 – Breach of Contract**

87.    The Servicemembers assert claims against the Landlord Companies for breach of the particular lease agreement ("Lease") to which the Landlord Companies and each of the Servicemembers are parties.

88.    Pursuant to Texas law, implicit in the Lease and/or as expressly represented therein is the warranty that the Landlord Companies were leasing houses to Servicemembers which were fit for human habitation and not replete with deplorable living conditions (including, without limitation, rainwater intrusion; leaking pipes; seeping sewage; excessive moisture; repulsive rodent and insect infestations; and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring and walls; faulty insulation; pervasive mold and other toxins; inescapable contamination due to the presence of asbestos and lead-based paint; deficient electrical, plumbing and HVAC systems; and other unacceptable departures from applicable building and housing codes).

89.    To date, the Landlord Companies have failed to comply with the material terms of each Lease by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation at the premises as set forth above in more detail. As such, the Landlord Companies have materially breached their leases with Servicemembers, causing them to suffer actual damages.

90.    Because of the Landlord Companies' breaches, Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future,

27

and attorneys' fees and costs pursuant to section 38.001 of the Texas Civil Practice and Remedies Code.

## Count 2 – Deceptive Trade Practices

91.     Pleading further, and in the alternative to the extent necessary, the Servicemembers are consumers as defined by the DTPA, as they sought to acquire goods and services by lease — namely a habitable, properly-maintained residence from the Landlord Companies.  The Landlord Companies are proper defendants under the DTPA.

92.     The Landlord Companies, in the course of leasing residences to the Servicemembers, violated the DTPA in multiple respects, including without limitation: (i) breaching the implied warranty of habitability;[14] (ii) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

a.   causing confusion or misunderstanding about affiliation, connection, or association with, or certification by, another;

b.   causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

c.   representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

d.   representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

e.   representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

f.   knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

g.   representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve;

---

[14] The Texas Supreme Court has recognized that, in a residential lease, the landlord impliedly warrants that the property is habitable and fit for human living as of the beginning of the lease and that such condition will remain in effect throughout the lease. *Kamarath v. Bennett*, 568 S.W.2d 658, 660-61 (Tex. 1978).

h. representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and

i. failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.[15]

93. Specifically, the Landlord Companies, by virtue of their course of administering, leasing, building, and repairing the housing units at issue, were uniquely aware of the condition of the houses, including without limitation the existence of mold, asbestos, rodent and/or insect infestations, and the electrical, plumbing, and HVAC issues associated with the housing units they manage. Nevertheless, the Landlord Companies knowingly and intentionally leased houses to Servicemembers, necessarily and as a matter of fact representing to Servicemembers that the houses were habitable and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

94. The Landlord Companies' knowing and intentional representations to Servicemembers were materially false and misleading. Servicemembers relied on the representations of the Landlord Companies in entering into the leases. However, the Servicemembers have discovered the houses were uninhabitable and not safe for human occupancy and have suffered medical issues as a result of occupying the houses. The Servicemembers have further discovered the Landlord Companies misled them into believing the houses had been properly maintained, and that the repair and remedy work Servicemembers requested during their tenancy was undertaken by qualified professionals and performed in a good and workmanlike manner so as to fully remedy

---

[15] *See* TEX. BUS. & COM. CODE §§ 17.46(b)(2), (3), (5), (7), (12), (13), (20), (22), (24).

the complained-of issues. Had Servicemembers had an opportunity to properly inspect the houses leased to them, and had the Landlord Companies disclosed the true nature of the damage to the houses, none of the Servicemembers would have entered into the respective leases.

95.    The Landlord Companies also misrepresented and caused confusion about the source, sponsorship, approval, and/or certification of goods or services. One way the Landlord Companies did this was through knowingly and intentionally misleading Servicemembers into believing, through their email signature lines, that their own employees are part of the Department of Defense or otherwise overtly affiliated with and/or acting under the immediate direction of the military.

96.    In reality, each of the houses leased to the Servicemembers suffers from such extreme deterioration and mold-related damage and infestation, such that the houses are not safe for human habitation. Mold pervades and grows in the houses. The moisture content of walls contributes to the ever-present moldy conditions, and without repair will only continue to get worse. HVAC systems leak as well and flood the houses. Rodents and insects pervade the walls and, in many cases, the living spaces.  In short, the Landlord Companies knowingly and intentionally leased Servicemembers' houses which were uninhabitable from the inception of the lease and the Landlord Companies subsequently refused to perform reasonable repairs to address the issues and make the houses fit for human habitation.

97.    Moreover, the Landlord Companies have utilized their relationship with the military, Servicemembers' status within the military, Servicemembers' relatively weaker economic position, the availability (or sometimes lack thereof) of military benefits associated with moving, and the good schools associated with living on military bases to effectively hold Servicemembers hostage in their leases until they received orders

stationing them elsewhere. Meanwhile, the Landlord Companies obtained the full amount of Servicemembers' BAH directly from the federal government, giving Servicemembers no discount for the size, quality, or condition of their house, nor for the substandard and deceptive performance of periodic and requested maintenance.

98.     The Landlord Companies' above-described knowing and intentional conduct in subjecting the Servicemembers to uninhabitable living conditions has been and remains a producing cause of economic damages, including without limitation, loss of base housing allowance, damage to personal property, repair bills, excessive utility bills, medical bills, and future medical bills. Moreover, each of the Servicemembers and their family members have suffered mental anguish damages as a result of the Landlord Companies' conduct in knowingly and intentionally placing them in uninhabitable housing units, with such mental anguish many times manifesting itself in physical symptoms associated with the conditions in which the Servicemembers were forced to live. The Servicemembers have also suffered mental anguish through concerns about their family members' wellbeing (as well as their own), their concerns about how and whether they could afford to escape those conditions, concerns about finding suitable housing, concerns about replacing personal property, stress caused by the constant relocation from one temporary residential placement to another, and sorrow over the loss of priceless and/or irreplaceable family heirlooms and records.

99.     The Landlord Companies' knowing and intentional acts and/or omissions as described herein were committed with actual awareness of the falsity, deception, or unfairness of an act or practice, or of a condition or defect that constitutes a breach of warranty, and with the specific intent of having the Servicemembers act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.

31

100.    As a result of the Landlord Companies' conduct, Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, treble damages, and attorneys' fees and costs as authorized by section 17.50 of the DTPA.

### Count 3 – Breach of Implied Warranty of Habitability, Breach of Implied Warranty of Good and Workmanlike Repairs, and Violations of Section 92.051 *et seq.* of the Texas Property Code

101.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for breaching the implied warranties of habitability and good and workmanlike repairs, and for violating the Texas Property Code, including but not limited to section 92.051 *et seq.*  Servicemembers have, in accordance with their leases and chapter 92 of the Texas Property Code, given the Landlord Companies notice of the myriad of issues identified herein associated with the houses each family has leased from the Landlord Companies. Nevertheless, the Landlord Companies knowingly and intentionally failed to repair defects (and/or to make such repairs in a good and workmanlike manner) and to make each house habitable for human occupation. To date, the housing units leased by Servicemembers suffer from pervasive mold and other conditions which materially affect the health and safety of occupants. The Landlord Companies have had adequate time to repair and/or remedy the unsafe and unsanitary conditions after Servicemembers' notices but have knowingly and intentionally failed to make a diligent effort to repair or remedy the conditions after receiving notice from the Servicemembers.

102.    Moreover, unique to the fact that the Landlord Companies are in the business of leasing to members of the military, obtaining rent payments directly from the federal government and providing housing on a base affiliated with good schools, the

Landlord Companies have effectively deprived Servicemembers of potential remedies, including, without limitation, withholding rent and performing repairs themselves, or terminating their respective leases and moving to suitable housing. The Landlord Companies hold the Servicemembers hostage—and the Landlord Companies know it.

103.    The Landlord Companies' conduct violates section 92.051 *et seq.* of the Texas Property Code and has further deprived Servicemembers of remedies that are statutorily prescribed. The Landlord Companies' conduct further violates the implied warranty of habitability and the implied warranty of good and workmanlike repairs.  As a result, Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, statutory damages, and attorneys' fees and costs as authorized by sections 92.056 and 92.0563 of the Texas Property Code.

### Count 4 – Negligence, Negligent Misrepresentation, and Gross Negligence

104.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies leased homes to Servicemembers with the above-described hazardous and deplorable conditions—but the Landlord Companies never notified the Servicemembers of such conditions.  The Landlord Companies were aware that the houses had such persistent and toxic defects, as prior tenants had made them aware of the hazards on numerous occasions.  After the Servicemembers moved into their homes and ultimately discovered the issues, they complained repeatedly to the Landlord Companies.  But the Landlord Companies refused to act to properly remediate or abate the problems despite knowledge that their failure to act would only exacerbate the problems.  When the Landlord Companies did act, they made only token repairs or permitted only token repairs to be made that did not eradicate the problem, resulting in continuing harm.

105.    The Landlord Companies, as specialized landlords in the business of privatized military housing, owed Servicemembers a duty to notify them of known problems with the housing, provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation. The Landlord Companies' conduct fell far below the applicable standard of care owed to the Servicemembers. The Landlord Companies' breaches of their duty include, without limitation, failing to notify the Servicemembers of known hazardous and deplorable conditions, failing to properly evaluate housing conditions to ensure leased properties were fit for human habitation and failing to properly repair and remedy those conditions affecting human health and safety.

106.    Moreover, the Landlord Companies, with specialized knowledge regarding the business of military tenancies and the properties leased to Servicemembers, and with a significant pecuniary interest in leasing houses to military families, falsely represented to Servicemembers that their houses were safe and fit for human habitation and were and would continue to be properly maintained, without exercising reasonable diligence in ascertaining whether the housing units were habitable and the representations were accurate. Servicemembers, who were neither given a meaningful opportunity to inspect the units leased to them, nor provided with the truth regarding the habitability of those units prior to signing leases on them, justifiably relied on the misrepresentations of the Landlord Companies to their detriment.

107.    The Landlord Companies engaged in the above-described acts and/or omissions with gross negligence, such that their acts or omissions, when viewed objectively from the Landlord Companies' standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm. Further, the Landlord Companies at all times had actual, subjective awareness of

the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of the Servicemembers and their families when they knew such acts and/or omissions would clearly and unquestionably result in dangerous health conditions and serious injury to their tenants, as well as destruction of their property. The Landlord Companies' concealment of the persistent and toxic conditions, and then their refusal to remediate the conditions, were among the Landlord Companies' acts and/or omissions which constituted gross negligence.

108.   As a proximate cause of the Landlord Companies' conduct, Servicemembers have incurred and seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and exemplary damages for the Landlord Companies' gross negligence pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

## Count 5 – Statutory Fraud in a Real Estate Transaction

109.   Pleading further, and in the alternative to the extent necessary, the Servicemembers allege statutory fraud.  Pursuant to section 27.01 of the Texas Business and Commerce Code, fraud in a transaction involving real estate consists of a false representation of past or existing material fact when the representation is made to a person to induce them to enter into a contract and relied on by that person in entering into that contract. Furthermore, fraud in a transaction involving real estate consists of a false promise to do an act when it is material, made with the intention of not fulfilling it, made to induce a person to enter into a contract, and relied upon by another in entering into that contract.

110.   The Servicemembers and the Landlord Companies clearly entered into leases, which are transactions involving real estate. In the course of those transactions,

the Landlord Companies represented to Servicemembers that the houses being leased to them were safe for human habitation and that the Landlord Companies would perform repair and remedy work to keep the houses habitable throughout the term of the leases. The Landlord Companies made these false representations to the Servicemembers fraudulently and/or maliciously so as to induce them to sign leases (including discussing repairs and remedies in documents associated with the Leases) and profit therefrom, and the Servicemembers justifiably relied upon those representations and promises because of the nature of the association between the military and the Landlord Companies, which exclusively control the leasing of on-base housing.

111.    However, because the houses managed and leased by the Landlord Companies suffer from pervasive mold and other conditions which have purportedly been "repaired" to no avail for years, it is readily apparent that the Landlord Companies were aware that their representations that the houses were fit for human habitation were false and that their litany of promises to perform future repairs and to make the houses habitable were made without any intention of fulfilling those promises.

112.    As a result, the Servicemembers suffered damages. They seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs pursuant to Chapter 27 of the Texas Business and Commerce Code. Servicemembers further seek to recover exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code because Servicemembers' damages arose from the Landlord Companies' fraud and/or malice.

### Count 6 – Common Law Fraud

113.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege common law fraud.   As described herein, the Landlord

Companies made multiple material omissions regarding the condition of the houses, and multiple material misrepresentations regarding the habitability of the units. The Landlord Companies also made material representations that repair work would be completed and/or had been completed, and that as a result, the units had become habitable and the problems had been resolved. The Landlord Companies were aware that all of their omissions of fact concerning the condition of the units were material when they presented Servicemembers with leases, and the Landlord Companies — because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting — knew their representations regarding the habitability of the houses were false and/or misleading. Despite knowing the falsity, the Landlord Companies made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

114.    The Landlord Companies intentionally omitted information and made the foregoing misrepresentations with the intent that Servicemembers would rely on them and enter into leases, and, in fact, Servicemembers did rely thereon to their detriment. The Servicemembers' reliance was justified given their lack of an ability to inspect the houses and given the Landlord Companies' power over the market. This conduct caused injury to the Servicemembers, including but not limited to paying rent for uninhabitable houses, excessive utility bills, environmental testing, moving and storage expenses, expenses for replacement of furniture and other items of personal property, and medical expenses in the past and to be incurred in the future.

115.    As a result of the Landlord Companies' conduct, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, mental anguish damages, and exemplary damages in accordance with Chapter 41 of the

Texas Civil Practice and Remedies Code, as Servicemembers' damages arose from the Landlord Companies' fraud and/or malice.

### Count 7 – Unjust Enrichment / Restitution / Money Had and Received

116.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege that, through the transactions described herein, the Landlord Companies were in the business of and were on notice that Servicemembers intended to lease from them habitable housing on the Military Installation(s). The Landlord Companies, through their conduct in leasing the Servicemembers substandard housing that the Landlord Companies failed to maintain in exchange for the Servicemembers' BAH, have been unjustly enriched and have received money from the Servicemembers that, in equity and good conscience, belongs to the Servicemembers and for which restitution is justly owed.

### Count 8 – Violations of the Residential Lead-Based Paint Hazard Reduction Act

117.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies have violated applicable provisions and associated regulations of the Residential Lead-Based Paint Hazard Reduction Act of 1992, Title X of the Housing and Community Development Act of 1992, U.S.C. § 4851, *et seq.* including, without limitation, by failing to provide notice to the Servicemembers with all available reports and/or records pertaining to the presence of lead or lead-based paint hazards.

118.    Given their actual and constructive knowledge regarding the presence of lead-based paint in the leased premises, the Landlord Companies' failure to fully comply with the applicable provisions of 42 U.S.C. § 4852d constituted a knowing violation of federal law.

119.    As a direct and proximate result of the Landlord Companies' conduct, the Servicemembers sustained actual damages including, without limitation, overpayment of rent given the fact the housing was not worth the amount the Servicemembers paid in rent to the Landlord Companies. Per 42 U.S.C. § 4852d(b)(3), the Landlord Companies are jointly and severally liable to the Servicemembers in an amount equal to three times the amount of damages incurred by each such person. Per 42 U.S.C. § 4852d(b)(4), the Landlord Companies are jointly and severally liable to the Servicemembers for the costs of this action, reasonable attorneys' fees, and any expert witness fees.

### Count 9 – Third-Party Beneficiary of Contract

120.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies are bound by the Underlying Contracts entered into with The United States of America.[16]  The Underlying Contracts constitute valid and enforceable contracts.

121.    The Servicemembers were intended beneficiaries of the Underlying Contracts including, without limitation, requirements in the applicable ground leases that the Landlord Companies ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential lease development in the local area.

122.    The Landlord Companies' obligations which were included in the Underlying Contracts were intended to ensure military personnel such as the Servicemembers named as Plaintiffs in this case (and their families) would be provided with safe and habitable housing while the Landlord Companies operated the housing at issue.   Recognition of the Servicemembers' right to performance is appropriate to

---

[16] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

effectuate the intention of the Underlying Contracts. Circumstances indicate that the parties to the Underlying Contracts, including the Landlord Companies named as defendants in this lawsuit, intended to benefit military personnel including the Servicemembers.

123. The Landlord Companies breached the requirements of the Underlying Contracts by engaging in conduct including, but not limited to, failure to ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential rental development in the local area.

124. The Landlord Companies also breached the requirements of the Underlying Contracts by engaging in conduct including but not limited to failing to adhere to federal, state and local lead-based paint regulations as required by the Underlying Contracts, and also by failing to comply with requirements in the Underlying Contracts by engaging in the aforesaid particulars.

125. The Landlord Companies' conduct also breached the duty of good faith and fair dealing implied in the Underlying Contracts.

126. As a direct, proximate and foreseeable result of the Landlord Companies' breaches of the Underlying Contracts, the Servicemembers, as intended, direct, third-party beneficiaries of such contracts, sustained damages. They are entitled to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future.

## Count 10 – Intentional Nuisance

127. Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for intentional

nuisance.  As described herein, the Landlord Companies  refused to act to maintain houses at the Military Installation(s) with the knowledge that their inaction would result in dangerous living conditions, or that  their inaction was substantially certain to result in dangerous living conditions, thereby interfering   with the Servicemembers' use and enjoyment of their leased homes.

128.    Such interference with the Servicemembers' enjoyment of their homes was substantial,  causing physical damage to their personal property, harm to their health, and   psychological harm to their "peace of mind" in the use and enjoyment of their homes.

129.    The effect of such substantial interference in the Servicemembers' enjoyment of their  property was unreasonable. The Landlord Companies created conditions that resulted in offensive and  intolerable living environments that endangered the Servicemembers' health and property.

130.    As a result of said conduct, the Servicemembers seek to recover from and against the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

## Count 11 – Negligent Nuisance

131.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert   claims  against   the Landlord Companies  for   negligent nuisance.  As described herein, the Landlord Companies negligently failed to act when they owed the Servicemembers  a duty as landlord and remediator to act, resulting in an unreasonable interference with the Servicemembers'   enjoyment of their homes.

132.    The Landlord Companies failed to take precautions against the risk that dangerous living   conditions would result from their inaction or substandard action when they had the ability   to control the repairs on the houses and abate such dangers.

133.     As a result of such conduct, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

### Count 12 – Strict Liability Nuisance

134.     Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for strict liability nuisance. As described herein, the Landlord Companies' conduct violates sections 341.011 and 343.011 of the Texas Health and Safety Code.

135.     For example, under section 341.011, the following are statutory public health nuisances: "sewage, human excreta, wastewater, garbage, or other organic wastes deposited, stored, discharged, or exposed in such a way as to be a potential instrument or medium in disease transmission to a person or between persons," "a collection of water that is a breeding area for mosquitoes that can transmit diseases," "a place or condition harboring rats in a populous area," and "an object, place, or condition that is a possible and probable medium of disease transmission to or between humans." *See* TEX. HEALTH & SAFETY CODE §§ 341.011(5), (7), (9), and (12).

136.     Despite being notified of such conditions, Defendants' failure to act has resulted in the above-described statutory violations. A person who causes, suffers, allows, or permits a violation under section 341.011 "shall be assessed a civil penalty of not less than $50 and not more than $5,000 for each violation.

137.     Under section 343.011, "a person may not cause, permit, or allow a public nuisance," which the statute defines as, among other things, "maintaining premises in a manner that creates an unsanitary condition likely to attract or harbor mosquitoes, rodents, vermin, or other disease-carrying pests" and "maintaining a building in a

manner that is structurally unsafe or constitutes a   hazard to safety, health, or public welfare." *See* TEX. HEALTH & SAFETY CODE §§ 343.011(b), (c)(3), (c)(5).

138.    As a result of Defendants' conduct,   Plaintiffs seek to recover from Defendants, jointly and severally, all actual damages, exemplary  damages, and costs and fees.

## ACCRUAL OF CLAIMS/DISCOVERY OF INJURIES

139.    Each of the Servicemembers began suffering injuries within the limitations period for all of the claims asserted herein. Specifically, they all began suffering medical conditions and suffered property damage at points in time after they moved into their applicable military housing units.

140.    Further, pleading in the alternative to the extent necessary, all Servicemembers are entitled to tolling of their claims on account of the Landlord Companies' fraudulent concealment. The Servicemembers had to rely on the Landlord Companies to perform maintenance and repairs. After each repair, the Servicemembers reasonably believed (in reliance upon the Landlord Companies' assurances) that the problems were remedied, or that there were no problems at all, when in reality the Landlord Companies had just hidden the problems. Only later did many of the Servicemembers discover that the Landlord Companies' so-called "repairs" were nothing but band-aid measures and that their health and/or property were imperiled.

141.    Further, pleading in the alternative to the extent necessary, the discovery rule tolls Servicemembers' claims. *See, e.g.*, Tex. Bus. & Com. Code § 17.565. All Servicemembers discovered the extent and true nature of their personal property damage only upon moving out. Additionally, under Texas law the discovery rule tolls mold-related personal injury claims until after onset of mold-related illness and until the plaintiff discovers the extent of mold and causally links it to ill health, which for all

Servicemembers occurred well within the limitations period. Thus, accrual of Servicemembers' claims occurred, at earliest, only after: (1) discovery of extent of the mold; (2) symptomatic manifestation of ill health; and (3) discovery of a causal connection between (1) and (2).

## CONDITIONS PRECEDENT

142.    All conditions precedent to the Servicemembers' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been provided or were waived, excused, or otherwise satisfied.

## ATTORNEY'S FEES & COSTS

143.    Pursuant to all applicable statutory provisions pled herein, including without limitation section 38.001 of the Texas Civil Practice and Remedies Code, section 27.01 of the Texas Business and Commerce Code, chapter 92 of the Texas Property Code, section 17.50(d) of the Texas Business and Commerce Code, and as otherwise allowed at law and/or in equity, the Servicemembers are entitled to recover from the Landlord Companies all of their reasonable and necessary attorneys' fees and expenses incurred in connection with this lawsuit. The Servicemembers are also entitled to recover from the Landlord Companies all costs of court.

## EXEMPLARY DAMAGES

144.    Pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code, because the injury suffered by the Servicemembers resulted from the fraud, malice, and/or gross negligence of the Landlord Companies, the Servicemembers are entitled to and seek the recovery of exemplary damages from the Landlord Companies.

## JOINT LIABILITY

145.    The Landlord Companies are jointly and severally liable to the Servicemembers on all causes of action asserted herein for a multitude of reasons.

44

146.    First, the Landlord Companies had a meeting of the minds and embarked on a systematic attempt to defraud Servicemembers by making false representations and promises to Servicemembers in order to induce them to lease with the Landlord Companies, without any legitimate expectation that they would provide Servicemembers with a habitable home as promised. The Landlord Companies engaged in one or more unlawful, overt acts to accomplish the actions complained of herein. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

147.    Second, the Landlord Companies are part of a joint enterprise or single business enterprise associated with the rental of houses at military installations in Texas and are not individually distinguishable. All the Landlord Companies carried on business as a mutual undertaking with a common business or pecuniary purpose and using the same common name, which is featured prominently on Servicemembers' leases and on websites designed for communication between Servicemembers and the Landlord Companies.  The Landlord Companies had an express or implied agreement for a common purpose to be carried out by their enterprise, had a community of pecuniary interest, and each had an equal right to direct and control the enterprise. Therefore, all the Landlord Companies were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

148.    Third,  the Landlord Companies intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act on behalf of one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another. Specifically, in all or nearly all email communications between Servicemembers and the Landlord Companies, the parties communicating on behalf of the Landlord Companies have signature blocks,

among other indications, clearly stated that they were being transmitted by as part of an affiliation/agency with each other. As a result, all the Landlord Companies acted as the agent of the others in the course of the conduct described herein. Therefore, all the Landlord Companies are jointly and severally liable as principals/agents for the claims asserted against each of them.

149.    Fourth, the Landlord Companies committed the acts complained of herein on behalf of one another and ratified the same. Each of the Landlord Companies approved these acts by word, act, and/or conduct after acquiring full knowledge of these acts, including accepting money from Servicemembers. This approval was given with the intention of giving validity to the acts. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

150.    Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor. All the Landlord Companies aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Servicemembers and to breach their duties as set forth herein. Each of the Landlord Companies did so knowingly and benefitted from such conduct. Therefore, each is jointly and severally liable for the same.

## JURY DEMAND

151.    Plaintiffs demand a trial by jury and tender the jury fee.

## PRAYER

WHEREFORE, premises considered, the Plaintiffs named herein pray that the Court grant them judgment against the Defendants named herein, jointly and severally, on all claims and for all relief sought herein, including but not limited to, judgment for:

a)  Actual damages in the past and future;

b)  Economic damages;

c)  Mental anguish damages;

d)  Statutory damages;

e)  Treble damages, including treble economic and treble mental anguish damages under the DTPA;

f)  Exemplary damages, as pled for herein;

g)  Reasonable and necessary attorneys' fees and costs of court;

h)  Pre-judgment interest at the highest rate allowed by law;

i)  Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

j)  All writs necessary to effectuate the judgment; and

k)  Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.


Dated: December 29, 2020                    Respectfully submitted,

                                            **WATTS GUERRA LLP**

                                            By: _/s/ Mikal C. Watts_____
                                                Mikal C. Watts
                                                Texas State Bar No. 20981820
                                                mcwatts@wattsguerra.com
                                                Francisco Guerra, IV.
                                                fguerra@wattsguerra.com
                                                Texas State Bar No. 00796684
                                                Robert Brzezinski
                                                Texas State Bar No. 00783746
                                                rbrzezinski@wattsguerra.com
                                                Jennifer Neal
                                                Texas State Bar No. 24089834
                                                jneal@wattsguerra.com
                                                4 Dominion Dr.
                                                Bldg. 3, Suite 100
                                                San Antonio, TX 78257
                                                (210) 447-0500 Telephone
                                                (210) 447-0501 Facsimile

                                            **PULMAN, CAPPUCCIO & PULLEN, LLP**
                                                Randall A. Pullman
                                                Texas State Bar No. 16393250

rpulman@pulmanlaw.com
Ryan C. Reed
Texas State Bar No. 24065957
rreed@pulmanlaw.com
Matthew J. McGowan
Texas State Bar No. 24098077
mmcgowan@pulmanlaw.com
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

**LAW OFFICES OF JAMES R. MORIARTY**
James. R. Moriarty
Texas State Bar No. 14459000
jim@moriarty.com
4119 Montrose, Suite 250
Houston, Texas 77006
(713) 528-0700 Telephone
(713) 528-1390 Facsimile

*Attorneys for Servicemember Plaintiffs*