## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JAMES C. HILL, JR., ET AL. | § | |
| | § | |
| V. | § | CASE NO. 5:20-CV-01473 |
| | § | |
| AETC II PRIVATIZED HOUSING, LLC, ET AL. | § | |

---

### AETC II PRIVATIZED HOUSING, LLC'S ANSWER,
### AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO
### PLAINTIFFS' ORIGINAL COMPLAINT

---

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

COMES NOW AETC II Privatized Housing, LLC (hereinafter individually by name or "Defendant") and reserving the right to file other and further pleadings, exceptions and denials, files this its Original Answer to Plaintiffs' Original Complaint previously filed herein, and in support thereof would show unto the Court as follows:

1.      Upon information and belief, Plaintiffs are or were at the time of leasing members of the military and were housed for various periods of time at Randolph Air Force Base ("Randolph"). AETC II Privatized Housing, LLC is the only "landlord" of the privatized housing at Randolph and Defendant denies that all Defendants are "Landlord Companies." Defendant attaches a true and correct copy of operable leases and addenda signed by each of the families.[1]

2.      Defendant denies the characterization and description of it in this paragraph. As stated above, AETC II Privatized Housing, LLC is the "landlord" for Randolph Family Housing, and is a limited liability company, 49% of which is owned by the United States of America acting

---

[1] Hill (Ex. A), English (Ex. B), Skillingstad (Ex. C), Castillo (Ex. D), and Oliver (Ex. E).

by and through the Secretary of the Air Force. The remainder of the allegations in this paragraph are denied.

3.      Defendant denies the allegations of paragraph 3.

4.      Defendant denies the allegations of paragraph 4.

5.      Defendant denies the allegations of paragraph 5.

6.      This paragraph is a recitation of the claims being asserted by Plaintiffs. To the extent that this paragraph asserts a claim or makes allegations against this Defendant, the paragraph is denied.

7.      Defendant denies the allegations of this paragraph.

## THE PARTIES

8.      Defendant admits that some or all of the Plaintiffs previously lived in housing at Randolph Air Force Base. The remaining allegations of paragraph 8 are denied.

9.      Defendant admits that it is a foreign corporation. The remainder of this paragraph is denied, as this Defendant has not previously appeared in this case.

10.     This paragraph is directed to another Defendant and therefore no response is required by this Defendant. To the extent that this paragraph asserts a claim against this Defendant, the paragraph is denied.

11.     This paragraph is directed to another Defendant and therefore no response is required by this Defendant. To the extent that this paragraph asserts a claim against this Defendant, the paragraph is denied.

12.     The allegations of paragraph 12 are denied.

13.     The allegations of paragraph 13 are denied.

## JURISDICTION AND VENUE

14.     Defendant re-alleges and incorporates the statements and responses in paragraphs 1 through 13 as if fully set forth herein.

15.     Defendant admits that this Court has jurisdiction due to: the claims underlying the action occurred on a federal enclave and as such present a federal question; Defendant acted as an agent of the United States and/or are persons acting under a federal office; and the claims involve issues of federal law as the Service Member of each family signed a "Military Lease Agreement" for "military housing" under the Military Housing Privatization Initiative which involve Substantial Federal Interest so that almost everything in the Plaintiffs' allegations implicates the United States Air Force and/or Armed Forces in one form or another.   The land constituting Randolph AFB was ceded by the State of Texas to the federal government in October 1951. The cession documents, including the Deed of Cession 63-111, documentation regarding the federal government's request for exclusive jurisdiction, and correspondences of Texas and federal agencies indicating the transfer to the federal government are attached as Collective Ex. F. The remaining allegations of Paragraph 15 are denied.

16.     Defendant admits this Court has federal enclave subject matter jurisdiction. The remainder of this paragraph refers to case law or statutes which speak for themselves and do not require a substantive response from this Defendant. To the extent that any of the cited cases or statutes could be read to deny federal enclave exclusive jurisdiction such is denied.

17.     Defendant admits that the events alleged in the Complaint occurred on Randolph Air Force Base, a federal enclave. On October 4, 1951 the Governor of the State of Texas caused the Great Seal of Texas to be affixed to a Deed of Cession which  provides:

> "…in the name and on behalf of the State of Texas, do hereby cede to the United States of America exclusive jurisdiction over the said described land, to hold, possess and exercise said jurisdiction over the same as long as the same remains the property of the United States of America; provided,

> however, that the cession of jurisdiction is made and granted upon the express condition that the State of Texas shall retain concurrent jurisdiction with the United States of America over every portion of the land so ceded, so far, that all process, civil and criminal, issuing under the authority of the State of Texas of any of the Courts of juridical officers thereof, may be executed by the proper officers of the State of Texas upon any person amendable to the same within the limits of the land over which jurisdiction is so ceded, in like manner and with like effect as if no such cession had taken place."

Ex. F. Defendant admits that the only concurrent jurisdiction retained by the State of Texas was for judicial process, nothing else. The correspondence between the Governor of Texas and the Department of the Air Force explicitly requested and granted exclusive jurisdiction, and the "Department of the Air Force acknowledge[d] receipt of a deed dated October 4, 1951 executed by [the Governor] on behalf of the State of Texas, ceding exclusive jurisdiction to the United States…notice is hereby given that the United States accepts exclusive jurisdiction over the land described in the Deed of Cession." Collective Ex. F. Defendant is without knowledge or information as to what "laws of the State of Texas with respect to housing units" are being referenced in this paragraph and the footnote therein and as such those are denied.  The remaining allegations of this paragraph are denied.

18.     Defendant admits that the purported claims of Plaintiffs arose on a federal enclave and federal law applies. The remainder of this paragraph refers to case law which speaks for itself and does not require a substantive response from this Defendant. To the extent that any of the cited cases could be read to deny federal enclave exclusive jurisdiction, such is denied.

19.     Defendant admits that this Court has subject matter jurisdiction over all claims in this case.  Defendant denies the remaining allegations of paragraph 19.

20.     Defendant admits the Court has personal jurisdiction over it. The remaining allegations of this paragraph are denied.

9695248.8

21.     Defendant admits the Court has personal jurisdiction over it. The remaining allegations of this paragraph are denied.

22.     Defendant admits the Court has personal jurisdiction over it. The remaining allegations of this paragraph are denied.

23.     Defendant admits that Venue is proper. The remaining allegations of this paragraph are denied.

## FACTUAL ALLEGATIONS

### The MHPI and the History of Privatized Military Housing

24.     Defendant admits that Congress enacted the National Defense Authorization Act in 1996, a part of which included the MHPI, which speaks for itself. The remainder of this paragraph does not make any allegations against this Defendant. To the extent that there are allegations against this Defendant in this paragraph, those allegations are denied.

25.     Defendant admits that Congress enacted the National Defense Authorization Act in 1996, a part of which included the Military Housing Private Initiative (MHPI) which speaks for itself. The remainder of this paragraph does not make any allegations against this Defendant. To the extent that there are allegations against this Defendant in this paragraph, those allegations are denied.

26.     Defendant admits that Congress enacted the National Defense Authorization Act in 1996, a part of which included the MHPI, which speaks for itself. The remainder of this paragraph does not make any allegations against this Defendant. To the extent that there are allegations against this Defendant in this paragraph, those allegations are denied.

27.     Defendant admits that Congress enacted the National Defense Authorization Act in 1996, a part of which included the MHPI, which speaks for itself. The remainder of this paragraph

9695248.8

does not make any allegations against this Defendant. To the extent that there are allegations against this Defendant in this paragraph, those allegations are denied.

28.     Defendant denies the allegations made in paragraph 28.

29.     Defendant admits that, pursuant to its lease agreements, AETC II Privatized Housing, LLC collects "rent" in the form of BAH. Defendant denies the remaining allegations in paragraph 29.

30.     Defendant admits that the purpose of the MHPI can be found in the statute itself and related materials.  Defendant also admits that the RFP for privatization disclosed certain information regarding the condition of the property. The remainder of this paragraph does not make any allegations against this Defendant. To the extent that there are allegations against this Defendant in this paragraph, those allegations are denied.

31.     Defendant admits that Reuters published a series of articles, but Defendant denies that the articles presented a full and accurate portrayal of privatized military housing in general and certainly did not present an accurate portrayal of military housing at Randolph AFB. Defendant denies the remaining allegations of this paragraph.

32.     Defendant admits that there were congressional inquiries into military housing, and denies the remaining allegations in this paragraph. This paragraph does not make any allegations against this Defendant. To the extent it could be read make allegations against this Defendant, those allegations are denied.

33.     Defendant admits that certain Senators made public statements during congressional hearings, but denies the remaining allegations in this paragraph.

34.     Defendant admits that certain Senators made public statements during congressional hearings; however, Defendant denies that the limited citation presents a full and

9695248.8

accurate portrayal of privatized military housing in general and certainly did not present an accurate portrayal of military housing at Randolph Air Force. Defendant denies the remainder of this paragraph.

35.   Defendant admits that there was testimony from witnesses at the congressional hearings; however, Defendant denies that the limited citation presents a full and accurate portrayal of privatized military housing in general and certainly did not present an accurate portrayal of military housing at Randolph Air Force. Defendant denies the remainder of this paragraph.

36.   Defendant admits that there was testimony from witnesses at the congressional hearings; however, Defendant denies that the limited citation presents a full and accurate portrayal of privatized military housing in general and certainly did not present an accurate portrayal of military housing at Randolph Air Force Base. Defendant denies the remainder of this paragraph.

37.   The allegations of paragraph 37 are denied.

38.   Defendant admits that John Ehle testified before Congress, and denies the remaining allegations of paragraph 38.  John Ehle's testimony specifically states: "Hunt welcomes the subcommittee's interest in military housing…We recognize that there is no such thing as maintenance-free housing and that issues will inevitably arise that must be remedied with both historic and new stock. When that happens, we consistently strive to address the situation in a timely and transparent manner. We are not perfect, of course, so we aim to learn from our mistakes in order to provide a better experience for our residents going forward."

39.   Defendant denies the allegations of paragraph 39.

40.   Defendant admits that Senator Warren submitted a report. The remaining allegations in the paragraph are denied.

41.   Defendant denies the allegations in paragraph 41.

9695248.8

42.     Defendant denies the allegations in paragraph 42.

43.     Defendant denies the allegations in paragraph 43.

### JAMES C. HILL, JR. AND KARI D. HILL

44.     Defendant admits the Hills moved into the unit on Randolph on February 17, 2017 and moved out in May 2020. Defendant denies the allegations in paragraph 44.

45.     Defendant admits the Hills moved into the unit on Randolph on February 17, 2017 and moved out in May 2020. Defendant admits that the Hill family reported certain work orders; however, the Hills did not cooperate in allowing housing to address certain maintenance and repair issues, but denies the remaining allegations in paragraph 45.

46.     Defendant is without knowledge or information sufficient to admit or deny whether Plaintiffs suffered from any medical conditions. Defendant denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph. Defendant denies the remainder of the allegation in paragraph 46.

47.     Defendant is without knowledge or information as to the testing Plaintiffs caused to be performed within the home and were not provided to Defendant.  The remaining allegations in paragraph 47 are denied.

48.     Defendant denies the allegations of paragraph 48.

49.     Defendant denies the allegations of paragraph 49.

### MICHAEL ENGLISH AND ELLDWINIA ENGLISH

50.     Defendant admits that the English family moved in October 2018 and moved out January 2020. There were only five children and a spouse listed in the rental contract, and there were six children and one spouse listed on the move in form, so this Defendant is without

knowledge related to others living in the home not listed within the rental documents provided at the time of leasing. Defendant denies the remaining allegations of paragraph 50.

51.     Defendant denies that the dates provided in paragraph 51 are correct. The proper dates of residency at 11 Outer Octagon are listed in this Defendant's response to paragraph 50. Defendant denies the remaining allegations of paragraph 51.

52.     Defendant denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph. Defendant denies the remainder of the allegation in paragraph 52.

53.     Defendant denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph. Defendant denies the remainder of the allegation in paragraph 53.

### SEAN SKILLINGSTAD AND RESSIA SKILLINGSTAD

54.     Defendant admits that the Skillingstad family began a lease at Randolph AFB housing in September 2017. The remainder of the allegations in this paragraph are denied.

55.     Defendant admits that the Skillingstad family lived at 4 Outer Octagon from September 2017 until June 2020. Defendant admits that the family called in certain maintenance requests during their residency which were addressed. The remainder of the allegations of paragraph 55 are denied.

56.     Defendant is without sufficient information to admit or deny the allegations of paragraph 56. Defendant specifically denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph. Defendant denies the remainder of the allegation in paragraph 56.

9695248.8

57.     Defendant is without sufficient information to admit or deny the allegations of paragraph 57.  Defendant denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph. Defendant denies the remainder of the allegation in paragraph 57. The remaining allegations of this paragraph are denied.

### RODOLFO CASTILLO AND LATASHA CASTILLO

58.     Defendant admits that the Castillo family moved into 5B 2nd Street East in November 2016, but they moved out October 12, 2018. There were only four minor children listed as the persons residing in the home within the lease. Ex. D. Defendant admits that certain maintenance requests were placed by the family during their nearly two year residency. The remaining allegations of this paragraph are denied.

59.     Defendant admits that certain work orders were reported during the Plaintiffs' residency. The remainder of the allegations in paragraph 59 are denied.

60.     Defendant is without sufficient information to admit or deny the allegations of paragraph 60.  Defendant denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph. Defendant denies the remainder of the allegation in paragraph 60. The remaining allegations of this paragraph are denied.

61.     Defendant denies the allegations in paragraph 61.  Defendant specifically denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph.

### BRADLEY OLIVER AND DEBORAH OLIVER

62.     Defendant admits that the Oliver family moved into 9 Southwest Drive in July 2017 and moved out March 29, 2019. Defendant admits that the Oliver family reported certain

maintenance requests during their residency. The remainder of the allegations in paragraph 62 are denied.

63.     Defendant is without sufficient information to admit or deny the allegations of paragraph 63.  Defendant denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph.

64.     Defendant is without sufficient information to admit or deny the allegations of paragraph 64.  Defendant denies any of the purported medical conditions of the Plaintiffs were caused by any condition of the housing unit at Randolph. The remainder of the allegations of this paragraph are denied.

## THE COMMON THEME

65.     Defendant denies the allegations in paragraph 65.

## The Underlying Contracts, Military Services' Standards, and Servicemember Leases

66.     Defendant admits that the design of the MHPI is set forth in the statute and related materials, which speak for themselves. There are no allegations against this Defendant contained within paragraph 66. To the extent that there is an allegation against this Defendant, such is denied. Defendant further states that the full purpose of MHPI can be found in the statutory record. Defendant incorporates the prior responses regarding MHPI herein.

67. Defendant admits that the design of the MHPI is set forth in the statute and related materials, which speak for themselves. There are no allegations against this Defendant contained within paragraph 67. To the extent that there is an allegation against this Defendant, such is denied. Defendant further states that the full purpose of MHPI can be found in the statutory record. Defendant incorporates the prior responses regarding MHPI herein.

9695248.8

68.     Defendant admits that AETC II Privatized Housing, LLC entered into a ground lease with the United States of America by and through the Secretary for the Air Force relating to the military housing project at Randolph AFB. Defendant denies the remaining allegations of paragraph 68.

69.     There are no allegations against this Defendant contained within paragraph 69. To the extent that there is an allegation against this Defendant, such is denied. Defendant further states that the purpose of MHPI and what it was "designed to do" can be found in the statute and congressional record. Defendant denies that Plaintiffs were intended or third party beneficiaries of any contract between AETC II Privatized Housing, LLC and the United States. To the contrary, the Lease of Property at Randolph AFB dated October 7, 2007 by and between AETC II Privatized Housing, LLC and the United States of America, portions of which are attached here to as Ex. G, specifically provides that ". . . there shall be no third party beneficiaries of this Agreement. . . " Ex. G, Section 24.11.  Additionally, the Master Development & Management Agreement (MDMA), also expressly disclaims third-party beneficiaries. Ex. G at § 10.15 (with exception for certain lenders, "Approved Mortgagees").

70.     Defendant denies the allegations in paragraph 70.

71.     Defendant admits that there was congressional testimony on privatized military housing.  Defendants denies the remaining allegations of paragraph 71.

72.     Defendant denies the allegations in paragraph 72.

73.     Defendant denies that any of the Plaintiffs lived in any unit that was "new construction." If there are allegations contained within this paragraph against this Defendant, such are denied.

9695248.8

74.     Defendant is without sufficient knowledge or information as to what specifically is being referenced in this paragraph and denies the same.

75.     Defendant admits that the Army Pamphlet speaks for itself, but denies that this document applies at Randolph AFB. The remaining allegations contained within paragraph 75 are denied.

76.     Defendant is without information or knowledge as to the specific documents referenced in this paragraph, that they are quoted accurately, or that they apply to Randolph AFB or this case. As such, this Defendant denies the allegations, if any, made in paragraph 76.

77.     Defendant denies the allegations of paragraph 77.

78.     Defendants denies the allegations of paragraph 78.

79.     Defendant admits that each servicemember Plaintiff entered into a lease agreement, which are attached to this Answer as Exhibits A (Hill), B (English), C (Skillingstad), D Castillo, and E (Oliver). Those lease agreements speak for themselves.  Defendant denies the remaining allegations contained in paragraph 79.

80.     There are no allegations contained in this paragraph but rather general opinion statements not specific to any Plaintiff. To the extent that any allegation can be interpreted as making an allegation against this Defendant, those are denied.

81.     Defendant admits that the congressional record speaks for itself. There is no allegation contained in this paragraph but rather general opinion statements not specific to any Plaintiff. To the extent that any allegation can be interpreted as making an allegation against this Defendant, those are denied.

82.     Defendant admits that the lease agreements speak for themselves. Defendant denies the remaining allegations in paragraph 82.

9695248.8

83.     Defendant admits that it has received complaints and repair requests, including from these Plaintiffs. Defendant denies the remaining allegations of paragraph 83.

84.     Defendant denies the allegations of paragraph 84.

85.     Defendant denies the allegations of paragraph 85.

## CAUSES OF ACTION

86.     Defendant reasserts and incorporates by reference the foregoing statements and defenses contained in the foregoing paragraphs as if fully reproduced herein.

### Count 1- Breach of Contract

87.     Defendant denies it breached any contract provision contained within the leases with each Plaintiff Servicemember. Those leases and addenda are attached as Exhibits. Exhibits A (Hill), B (English), C (Skillingstad), D (Castillo), and E (Oliver).

88.     Defendant admits that the lease agreements speak for themselves and denies the remaining allegations of paragraph 88.

89.     Defendant denies the allegations of paragraph 89.

90.     Defendant denies the allegations of paragraph 90 and denies that Plaintiffs are entitled to any relief.

### Count 2 – Deceptive Trade Practices

91.     Defendant denies the allegations of paragraph 91 and denies that the DTPA applies to the allegations and claims presented in this Complaint.

92.     Defendant denies the allegations of paragraph 92, including those in sub-paragraphs a-I, and denies that the DTPA applies to the allegations and claims presented in this Complaint.

9695248.8

93.     Defendant denies the allegations of paragraph 93, and denies that the DTPA applies to the allegations and claims presented in this Complaint.

94.     Defendant denies the allegations of paragraph 94, and denies that the DTPA applies to the allegations and claims presented in this Complaint.

95.     Defendant denies the allegations of paragraph 95, and denies the DTPA applies to the allegations and claims presented in this Complaint.

96.     Defendant denies the allegations of paragraph 96, and denies the DTPA applies to the allegations and claims presented in this Complaint.

97.     Defendant denies the allegations of paragraph 97, and denies the DTPA applies to the allegations and claims presented in this Complaint.

98.     Defendant denies the allegations of paragraph 98, and denies the DTPA applies to the allegations and claims presented in this Complaint.

99.     Defendant denies the allegations of paragraph 99, and denies the DTPA applies to the allegations and claims presented in this Complaint.

100.    Defendant denies the allegations of paragraph 100, denies the DTPA applies to the allegations and claims presented in this Complaint, and denies the Plaintiffs are entitled to any recovery from this Defendant.

### Count 3- Breach of Implies Warranty of Habitability, Breach of Implied Warranty of Good and Workmanlike Repairs, and Violations of Section 92,051 et seq. of the Texas Property Code

101.    Defendant denies the allegations of paragraph 101 and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

102.    Defendant denies the allegations of paragraph 102.

9695248.8

103.    Defendant denies the allegations of paragraph 103 and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

### Count 4- Negligence, Negligent Misrepresentation, and Gross Negligence

104.    Defendant denies the allegations of paragraph 104.

105.    Defendant denies the allegations of paragraph 105.

106.    Defendant denies the allegations of paragraph 106.

107.    Defendants denies the allegations of paragraph 107.

108.    Defendant denies the allegations of paragraph 108 and denies that Plaintiffs are entitled to any recovery from this Defendant.

### Count 5- Statutory Fraud in a Real Estate Transaction

109.    Defendant denies the allegations of paragraph 109 and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

110.    Defendant denies the allegations of paragraph 110 and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

111.    Defendant denies the allegations of paragraph 111 and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

112.    Defendant denies the allegations of paragraph 112 and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal

enclave and as such are governed by federal law. Defendant further denies that Plaintiffs are entitled to any recovery from this Defendant.

### Count 6 – Common Law Fraud

113.    Defendant denies the allegations of paragraph 113.

114.    Defendant denies the allegations of paragraph 114.

115.    Defendant denies the allegations of paragraph 115, and denies that Plaintiffs are entitled to recover any damages from this Defendant.

### Count 7 – Unjust Enrichments/Restitution/Money Had and Received

116.    Defendant denies the allegations of paragraph 116.

### Count 8 – Violations of the Residential Lead-Based Paint Hazard Reduction Act

117.    Defendant denies the allegations of paragraph 117.

118.    Defendant denies the allegations of paragraph 118.

119.    Defendant denies the allegations of paragraph 119 and denies that Plaintiffs are entitled to any recovery from this Defendant.

### Count 9 – Third-Party Beneficiary of Contract

120.    Defendant admits that there are contracts by and between AETC II Privatized Housing, LLC and the United States of America by and through the Secretary of the Air Force. Defendant is without knowledge of information sufficient to admit or deny what "Underlying Contracts" are being referenced. The remaining allegations of this paragraph are denied.

121.    The allegations of paragraph 121 are denied.

122.    The allegations of paragraph 122 are denied.

123.    The allegations of paragraph 123 are denied.

124.    The allegations of paragraph 124 are denied.

9695248.8

125.    The allegations of paragraph 125 are denied.

126.    The allegations of paragraph 126 are denied. Defendant further denies that Plaintiffs are entitled to any recovery from this Defendant.

### Count 10 – Intentional Nuisance

127.    The allegations of paragraph 127 are denied.

128.    The allegations of paragraph 128 are denied.

129.    The allegations of paragraph 129 are denied.

130.    The allegations of paragraph 130 are denied. Defendant further denies that Plaintiffs are entitled to any recovery from this Defendant.

### Count 11 – Negligent Nuisance

131.    The allegations of paragraph 131 are denied.

132.    The allegations of paragraph 132 are denied.

133.    The allegations of paragraph 133 are denied. Defendant further denies that Plaintiffs are entitled to any recovery from this Defendant.

### Count 12 – Strict Liability Nuisance

134.    The allegations of paragraph 134 are denied and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

135.    The allegations of paragraph 135 are denied and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

9695248.8

136.    The allegations of paragraph 136 are denied and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

137.    The allegations of paragraph 137 are denied and denies the applicability of the Texas statute cited in this paragraph as the alleged actions or omissions occurred on a federal enclave and as such are governed by federal law.

138.    The allegations of paragraph 138 are denied. Defendant further denies that Plaintiffs are entitled to any recovery from this Defendant.

## ACCRUAL OF CLAIMS/DISCOVERY OF INJURIES

139.    Defendant denies the allegations of paragraph 139.

140.    Defendant denies the allegations of paragraph 140.

141.    Defendant denies the allegations of paragraph 141.

## CONDITIONS PRECEDENT

142.    Defendant denies the allegations of paragraph 142. Defendant specifically denies that "all conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied." Should Texas state law apply to the property damage claims in this case, which Defendant denies, Defendant denies that "all notices have been provided or were waived, excused or otherwise satisfied." More specifically, certain Plaintiffs' compliance with the DTPA pre-suit notice was inadequate in terms of timing and/or substance. Plaintiffs did not comply with the dispute resolution policy, which is part of and incorporated into their lease agreements.  Some or all Plaintiffs may not have complied with the Mold/Mildew Addendum incorporated in the lease which requires, among other things, appropriate climate control, cleaning, removal of visible moisture accumulation, and prompt reporting of certain conditions in the home. Additionally, some

or all Plaintiffs actively and with purpose prevented maintenance from addressing work orders and/or complaints so that the situation would worsen and form the basis of their lawsuit. Some or all Plaintiffs failed to comply with the access for repairs provisions of the lease agreements to ensure the Premises are maintained, not in need of repair, inspect, and/or make necessary repairs, alterations or otherwise.  Certain Plaintiffs, without approval from the Installation's Housing Management Officer, caused to be housed additional persons in the residence, failed to list those persons in the lease and otherwise failed to follow the occupancy limitations within the lease. To the extent that Texas law applies to Plaintiffs' purported claims for exposure to asbestos, any Plaintiff alleging an injury based upon asbestos exposure has failed to comply with the requirements of Chapter 90 and, therefore, any claim related to asbestos exposure fails and should be dismissed. Should Texas law apply to property damage claims within the federal enclave, which Defendant denies, Plaintiffs failed to properly give notice under Texas Property Code § 92.056. Plaintiffs have failed to provide notice by manner and mechanisms called for under the Texas Property Code and therefore no claim may arise under that section, should it apply at all in this case.

## ATTORNEY'S FEES & COSTS

143.    Defendant denies the allegations of paragraph 143, and denies that Plaintiffs are entitled to any recovery from this Defendant.

## EXEMPLARY DAMAGES

144.    Defendant denies the allegations of paragraph 144, and denies that Plaintiffs are entitled to any recovery from this Defendant.

## JOINT LIABILITY

9695248.8

145.    Defendant denies the allegations of paragraph 145, and denies it is liable to Plaintiffs for any damages.

146.    Defendant denies the allegations of paragraph 146.

147.    Defendant denies the allegations of paragraph 147.

148.    Defendant denies the allegations of paragraph 148.

149.    Defendant denies the allegations of paragraph 149.

150.    Defendant denies the allegations of paragraph 150.

## JURY DEMAND

151.    Plaintiffs have demanded a jury. Defendants likewise request a jury. Should Plaintiffs' Unjust Enrichment/Restitution/Money Had and Received "claim" survive, which it should not, then that equitable remedy is the sole province of the court. There is no Seventh Amendment right to a jury on unjust enrichment claims as "disgorgement" as a remedy was not available at law in 1791 (when the Seventh Amendment was ratified) and/or was not a right at law but at equity and no jury should pass on that "claim."

## PRAYER

Defendant denies the paragraph beginning "WHEREFORE," including sub-paragraphs a-k. Defendant denies Plaintiffs are entitled to recover any type of damages whatsoever from this Defendant. Defendant prays to be dismissed from this action with costs and any other relief it is so entitled. As Plaintiff has pled a number of different Texas statutes which they claim apply to this case, as denied by Defendants, should these actions be viable in this case Defendant pleads the limitations of Tex. Civ. Prac. & Remedies Code §41.0105 such that "[i]n addition to any other limitations under law, recovery of medical or health care expenses incurred is limited to the amount

actually paid or incurred by or on behalf of the claimant." As a general matter, all averments contained with Plaintiffs' Complaint are denied unless expressly admitted.

### First Defense

This action is barred by the applicable statute of limitations or of repose and/or the doctrine of laches.

### Second Defense

The negligence of Plaintiffs proximately caused or contributed to the alleged damages injuries or loss, if any was sustained. Any recovery is therefore barred or should be diminished accordingly.

### Third Defense

The acts or admissions of others over whom this Defendant had no control, whose acts or omissions this Defendant had no reason to anticipate, and for whom this Defendant is not liable, proximately caused or contributed to the damages, injuries, or loss, if any were sustained. These acts or omissions of others constituted intervening cause(s) and supersede any alleged wrongful act or omission on the part of this Defendant.

### Fourth Defense

Plaintiffs assumed the risk of the alleged damages, injuries, or loss, if any.

### Fifth Defense

Plaintiffs failed to mitigate damages, if any.

### Sixth Defense

Defendant is entitled to credit in the amount of settlements received by Plaintiffs.

### Seventh Defense

9695248.8

All or part of Plaintiffs' claims which are the basis of this lawsuit have either been settled or adjudicated and therefore, the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, acquiescence, election of remedies, payment and release, waiver, and accord and satisfaction bar Plaintiffs' claims against this Defendant.

### Eight Defense

Plaintiffs' claims against this Defendant are speculative and there can be no recovery from this Defendant.

### Ninth Defense

Plaintiffs failed to plead Fraud with particularity as required under Fed. R. Civ. P. 9(b) and should therefore be dismissed against this Defendant.

### Tenth Defense

The Complaint should be dismissed for failure to state a claim against this Defendant upon which relief can be granted.

### Eleventh Defense

At all relevant times, Plaintiffs' home complied with all applicable governmental building codes, standards, regulations, and specifications.

### Twelfth Defense

The injuries, if any, for which Plaintiffs seek recovery resulted from Plaintiffs' pre-existing illnesses or conditions.

### Thirteen Defense

This Defendant is entitled to any sovereign or governmental immunity available to the United States of America, including but not limited to the immunity set forth in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).

9695248.8

**Fourteenth Defense**

Liability for Plaintiffs' damages, if any, is due to the negligence and/or conduct of others.

**Fifteenth Defense**

Defendant reserves the right to assert any and/or all applicable affirmative defense which discovery may reveal appropriate.

**Sixteenth Defense**

Plaintiffs are not entitled to an award of punitive damages because they failed to allege sufficient facts within the Complaint to demonstrate any conscious disregard for the safety of Plaintiffs, or any willful, wanton or malicious act or omissions, or any other act of conduct on the part of this Defendant which could form the basis for an award of punitive damages.

**Seventeenth Defense**

No Plaintiff is entitled to recover punitive or exemplary damages in any form or fashion in this case in that it would violate this Defendant's rights under the Constitution of the United States and, where applicable, the Constitution of the State of Texas. Any award of exemplary or punitive damages, in the absence of appropriate standards, procedures to ensure their application, and adequate review, would be unreasonable, arbitrary, capricious and confiscatory, would have no relation to any ascertainable facts, and therefore would afford this Defendant no adequate means of defense in appellate review.

**Eighteenth Defense**

The imposition of punitive damage in this action violates this Defendant's constitutional right of due process under the Texas Constitution and the United States Constitution because it creates an unnecessary and undue risk of an improper verdict on the issue of liability, on the

9695248.8

measure of compensatory damages, on the issue of whether to award punitive damages, and on the measure of punitive damages.

## **Nineteenth Defense**

This Defendant asserts that any award of punitive damages would violate this Defendant's constitutional rights in that:

a.  Any instruction defining conduct warranting punitive damages is vague and violates the Fifth and Fourteenth Amendments to the United States Constitution;

b.  An allowance of punitive damages in this case would violate the Commerce Clause, Article I, Section 8, United States Constitution;

c.  An allowance of punitive damages in this case would expose this Defendant to multiple awards of damages and therefore subject it to double jeopardy for the same alleged acts and would violate this Defendant's right to protection from "excessive fines" as provided in the Eighth Amendment; and

d.  An allowance of punitive damages in this case would violate the Ex Post Facto Clause of the United States Constitution.

## **Twentieth Defense**

Defendant asserts that Plaintiffs waived any and all alleged breaches of contract by this Defendant by continuing to request and receive performance under the contract alleged in the Complaint as well as continuing to live within the unit.

## **Twenty-First Defense**

Defendant alleges that the government contractor defense (*see, e.g. Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988)), applies as Defendant discharged their duties relating to the military housing at Randolph Air Force Base at which the Plaintiffs' former units are located,

in accordance with "reasonably precise standards" and duties the United Sates Air Force pursuant to contractual agreements and with full participation of the United State Air Force as part-owner of this Defendant.

### Twenty-Second Defense

Defendant asserts that Plaintiffs directed, ordered, and/or approved Defendant's conduct, thereby barring Plaintiffs from seeking the relief prayed for in the Complaint.

### Twenty-Third Defense

Defendants allege that to the extent that Plaintiffs have or will receive collateral source benefits in full or partial payments of the damages sought by the Complaint, Defendants are entitled to a set off of any recovery against it to the extent of all benefits paid, or payable to, or on behalf of Plaintiffs from any collateral source.

### Twenty-Fourth Defense

Defendant was performing duties under contract with the United States government at the direction of and authorization of the United States Air Force and/or other governmental authorities, so that Defendant is immune from suit based on its performance of such contract under any and all legal theories applicable to such facts, including but not limited to governmental contractor immunity as set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). Defendant asserts any and all claims took place on a federal enclave and as such Texas law does not apply except to the extent applicable when the base was accepted by the United States government. As such, many of the claims are inapplicable and should be dismissed, as set forth more fully in Defendant's Motion to Dismiss incorporated herein.

### Twenty-Fifth Defense

9695248.8

Defendant denies Plaintiffs have alleged a claim against this Defendant upon which relief can be granted, including an award of actual or punitive damages.

### Twenty-Sixth Defense

Plaintiffs' injuries, if any, were caused by the negligence or fault of parties over whom this Defendant has no control. Preserving all assertions of federal enclave and exclusive federal jurisdiction, Defendant is entitled to an apportionment of fault pursuant to Chapter 33 of the Texas Civil Practice and Remedies Code within the meaning of those terms under Texas law, or alternatively, under the law of this case should Texas law apply therein. Defendant reserves the right to make an election of credit for settlement before the issues are submitted to the trier of fact.

### Twenty-Seventh Defense

Certain Plaintiffs cannot claim fraud in the inducement because they ratified the lease when they allowed the lease to automatically renew at the end of the initial one-year lease term.

### Twenty-Eight Defense

Plaintiffs' claims for intentional nuisance should be dismissed as Plaintiffs have failed to plead facts sufficiently alleging that this Defendant behaved negligently and had the deliberate knowledge or believe that their remediation efforts would prove useless, as claimed.

### Twenty-Ninth Defense

Plaintiffs have failed to provide a sufficient basis for strict-liability nuisance.

### Thirtieth Defense

The Federal Tort Claims Act authorizes actual and compensatory damages. Punitive damages and prejudgment interest are specifically not allowed under 28 U.S.C. § 2674 and as such any claims for such should be dismissed.

### Thirty-First Defense

9695248.8

Certain Plaintiffs prevented and frustrated efforts to remediate, clean, or otherwise address claimed conditions in the unit.

### Thirty-Second Defense

Many of Plaintiffs complaints and alleged wrongs related to the MHPI under which these Plaintiffs have no standing to bring suit. Any and all allegations, statement or otherwise related to general MHPI complaints should be stricken from the Complaint. Furthermore, as demonstrated by the attachments, Plaintiffs have no right as third party beneficiaries to the contract by and between the United States Air Force and this Defendant. Plaintiffs have no standing to make any claim under those contracts. Plaintiffs have no standing to assert violations of any Air Force or other military memorandum, guidance, or directive.

### Thirty-Third Defense

Plaintiffs have failed to fulfill all conditions precedent and applicable notice requirements, including but not limited to: DTPA pre-suit notice was inadequate in terms of timing and/or substance; Plaintiffs did not comply with the dispute resolution policy which is part of and incorporated into their lease agreements; some or all Plaintiffs may not have complied with the Mold/Mildew Addendum incorporated in the lease which requires, among other things, appropriate climate control, cleaning, removal of visible moisture accumulation, and prompt reporting of certain conditions in the home; some or all Plaintiffs actively and with purpose prevented maintenance from addressing work orders and/or complaints so that the situation would worsen and form the basis of their lawsuit; some or all Plaintiffs failed to provide access to landlord during occupancy for repairs; should Texas state law apply within the federal enclave, which Defendant denies as to property damage claims, any Plaintiff alleging an injury based upon asbestos exposure has failed to comply with the requirements of Chapter 90 and, therefore, any

claim related to asbestos exposure fails and should be dismissed; should Texas law apply within the federal enclave, which Defendant denies as to property damage claims, Plaintiffs failed to properly give notice under Texas Property Code § 92.056; some or all Plaintiffs have failed to provide notice by manner and mechanisms called for under the Texas Property Code, should that statute apply in this case.

## AETC II Privatized Housing, LLC's Counterclaim

### Introduction

1.      Hill and his family are lead plaintiffs in this litigation, which takes aim at the Military Privatization Housing Initiative as a whole, all of the providers of privatized military housing, and AETC Housing's conduct at Randolph AFB in general and with respect to the Hill residence.   In this litigation, Hill raises serious allegations against AETC Housing that "the dilapidated, unhealthy, and destructive conditions they encountered their first day there continued to plague them until the day the family left."  Complaint, ¶44.

2.      However, the actual facts surrounding the Hills' tenancy tell quite a different story.

3.      While the Hill's Complaint now says that they encountered these conditions on the first day, Hill represented by his signature to the Lease that the unit was in good condition, the Hills' own inspection submitted days later made no mention of mold, and his sole maintenance request on the first day was for another key.  Hill's first maintenance request for mold came nine months later and was resolved timely and satisfactorily. Over the course of their three-year residency the Hills would, on occasion, complain of mold, but they repeatedly deferred, delayed, and ultimately refused necessary repairs to address their concerns.  Beginning in May 2019 and continuing through November 2019, AETC Housing recommended HVAC duct cleaning, but the Hills could not and would not schedule four hours when they would be away from the home.

AETC Housing likewise recommended that the home undergo the Humidity Reduction Project would have, among other things, installed Humidistat-controlled vents in the bathrooms, and a whole home dehumidifier which would aid in reducing moisture in the bathrooms and throughout the home.  The Hills refused all of these recommendations in 2019, and did not report any other problem until March, 2020.   In March, the Hills reported, and AETC Housing's inspection confirmed, that mold had grown in the bathrooms.  AETC Housing requested immediate access to conduct repairs and remediate the mold, and offered to provide housing and financial accommodations while those repairs were done.  The Hills refused access to conduct repairs, claiming they intended to vacate in mid-May upon retirement. When they vacated in May, the mold they complained about had been cleaned by the Hills and was gone.

4.     All of Hill's conduct described above violated their contractual obligations owed to AETC Housing under the Lease Agreement.  Hill had the opportunity and duty to inspect the Premises, represented by signing the Lease Agreement that "the Premises were rented in good order and repair" and in "good, safe and habitable condition," but now claims that he encountered "dilapidated, unhealthy, and destructive conditions" on his very first day. Hill contracted to permit AETC Housing access and allow AETC Housing to conduct necessary repairs, and repeatedly delayed access, and deferred and refused repairs.  Hill was under a duty to prevent moisture, clean mold if it appeared, and timely report any mold or potential mold; yet the Hills allowed the mold to grow.

5.     Hill's conduct, described above and in more detail below, breached his contractual agreements with AETC Housing, and caused damage, the nature and scope of which will be proven fully at trial.

## PARTIES

9695248.8

6.      AETC Housing is a foreign corporation and Defendant in this action which owns certain real property located in this district, and has entered into a Lease Agreement relating to that real property with James C. Hill.

7.      James C. Hill ("Hill") is a Plaintiff in this action, entered into a certain Lease Agreement with AETC Housing for real property located in this District, and has breached the terms of that Lease Agreement.

**JURISDICTION & VENUE**

8.      Jurisdiction and venue are proper in this Court on the same basis stated in the Complaint.

**RELEVANT FACTS**

9.      Hill entered into a Lease Agreement with AETC Housing on or about February 17, 2017. A copy of the Lease Agreement is attached as Exhibit A. ("Lease Agreement").  The Lease Agreement also contains various addenda, including the Mold/Mildew Addendum attached as Exhibit 4 to the Lease Agreement and also signed by Hill on February 17, 2017 ("Mold Addendum").

10.      On or about February 17, 2017, Hill also executed the Move In/Over Form, and put his initials indicating that he "will walk the home myself and return the move in inventory." Exhibit H. A few days later, on February 22, 2017, Mrs. Hill signed and completed the Move In Move Out Form ("MIMO"), attached hereto as Exhibit I, which requests a room by room description of any damage to the Premises and specifically provides that "the premises are being delivered in clean, sanitary, and good operating condition . . unless otherwise noted below . . ." While Mrs. Hill did list items such as "scratches," "dents," and "discoloration," she disclosed no mold, no unhealthy or dangerous conditions, and nothing outside of ordinary wear and tear.

9695248.8

11.     Hill's only maintenance request on the first day, February 17, 2017, was for an additional key to the unit, and that was it.

12.     The first maintenance request related to mold in the residence did not occur until November 20, 2017, nine months later.  That complaint for mold on a picture was timely addressed and resolved.

13.     In April of 2019, AETC Housing responded to a maintenance request regarding a roof leak repair in an upstairs bedroom and gutter cleaning. The work was started and completed on the same day.

14.     On April 26, 2019, AETC Housing received an e-mail from Dianne Butler at the Military Housing Office ("MHO") forwarding maintenance concerns reported by Hill to MHO (but not AETC Housing). AETC Housing requested a walk through on April 30 to address her concerns, but Mrs. Hill said she would not be available until the week of May 6.

15.     After the belated walk through was completed, Michael Knight, Senior Director of Maintenance & Facilities, met with Hill and Mrs. Hill to discuss maintenance concerns and open work orders.  Knight recommended Humidity Reduction Project work to address Hill's moisture and mold concerns. Knight explained that the Humidity Reduction Project was designed to reduce humidity in the living space of these historic units and would include, among other things, installation of an in-line dehumidifier with the HVAC system and installation and/or replacement of vents in the bathrooms that are controlled by a separate dehumidification system. Knight explained that because of the work to be done, the Hills had to temporarily vacate the premises, but that AETC Housing would provide free lodging and financial compensation for any inconvenience.  The Hills would not accept or agree to the Humidity Reduction Project work.

16.     Michael Knight met with Mrs. Hill again in August 2019 to discuss the Hill's maintenance concerns. At that time, Knight proposed that the Hills at least allow the HVAC ducts to be cleaned, which would only require the Hills to vacate their home for four hours. The Hills refused. AETC Housing contacted the Hills in September and October to follow up on work done by contractors related to other completed maintenance requests for pest control and a window-sill crack.

17.     In October of 2019, AETC Housing maintenance staff again met with Mrs. Hill to discuss needed repairs. After this meeting, AETC Housing contacted Mrs. Hill several times to schedule any remaining items and schedule the duct cleaning, to no avail.

18.     In November 2019 Michael Knight reached out to Mrs. Hill again requesting access to the unit to complete all of the proposed repairs.  As of November of 2019, AETC Housing had proposed the Humidity Reduction project work, duct cleaning, and completion of open work orders, all of which had been refused and rejected by the Hills.

19.     AETC Housing did not hear from the Hills again for another four months, until March 20, 2020. At that time, Mrs. Hill told MHO that she had texted AETC Housing regarding mold concerns and but received no response. AETC Housing received no such texts from Mrs. Hill. However, once informed of the mold concerns, AETC Housing responded that same day and performed a visual inspection of the unit. The visual inspection revealed significant mold and moisture issues in the bathrooms of the residence. AETC Housing recommended immediate repairs to address the mold growth in the residence, but Mrs. Hill refused to have any work begin.

20.     On March 23, 2020 AETC Housing contacted Mrs. Hill and told her, "[i]t is our goal to get in and start the repairs immediately as the health and safety of your family is our top concern." Ex. J. AETC Housing also reminded Mrs. Hill that the duct cleaning and Humidity

Reduction Project work was never completed and again strongly recommended that the work take place so that the conditions in the unit did not worsen:

> We would like to complete the duct cleaning which we recommended back in July, but unfortunately has been delayed because we haven't received your approval to access and schedule a half day when the house would be clear. . . I would like to extend again the offer to complete the Humidity Reduction project. . . We strongly recommend that you allow us to do this work so that the conditions in your home do not worsen.

Ex. J at ¶2-4.

21.     Rather than simply permit AETC Housing's necessary repairs to address concerns, Mrs. Hill demanded that "a third party licensed professional to test the growth on the walls, on my property, and in the air," which neither CDC nor EPA recommends or requires.  Ex. J.

22.     Ultimately, a third-party inspection by a certified mold assessor occurred on April 2, 2020. Their report, provided to the Hills, indicated the presence of suspected microbial substances and recommended immediate remediation – exactly what AETC Housing had been requesting to accomplish. Ex. K.

23.     AETC Housing recommended the necessary repairs be done as soon as possible and scheduled a start date of April 13, 2020. Ex. K. The repairs could not be performed while the Hills occupied the home so AETC Housing offered free temporary re-location facilities ("TLF"), a daily per diem rate, and a daily rent concession. Ex. K.  Because the unit would be vacant, AETC Housing also proposed the duct cleaning and Humidity Reduction Project be simultaneously completed. Ex. K. The Hills refused these suggested repairs.

24.     Mrs. Hill refused to approve the scheduled start date stating, "Next week is not suitable for us." Ex. K at April 9, 2020 email ¶1. Mrs. Hill also refused to vacate the premises. "The inconvenience of having to be separated from all of our personal belongings while we are preparing to move does not seem appropriate. . ." Ex. K at April 9, 2020 email ¶1. In response,

AETC Housing proposed alternate start dates, but reminded the Hills that "this is an urgent situation, and we must get this work completed as soon as possible." Ex. K at April 10, 2020 email ¶1.

25.     The Hills again rejected a start date, and questioned the need for the work at all and the necessity of the temporary relocation while the work was done:

> Why is it this urgent that the mold remediation work be done?. . . Why do we have to be locked out of our house and away from our belongings while this work is done?

Ex. K at April 11, 2020 email.  AETC Housing explained that all mold calls were treated as urgent and the need to "resolv[e] this issue both correctly and in the most expeditious manner." Ex. K at April 11, 2020 email.

26.     AETC Housing sent two more emails to the Hills on April 13, 2020, the original date the work was scheduled to start. Because the Hills refused access, the start date was moved to the following day, April 14, 2020. Ex. K at April 13, 2020 email. The Hills refused, stating "[w]e will not be leaving our house this week or prior to our move out date," which was some weeks later Ex. K at April 13, 2020 email ¶3.

27.     On April 14, 2020, the second start date for the work, the Hills again refused access and repairs. AETC Housing reiterated the necessity of the repairs for health and safety reasons, and delayed the work until noon on Wednesday April 15, 2020. AETC Housing offered the Hills, again, the Hospitality Suite for their temporary relocation, and reminded them of the Lease provisions granting the right to enter the premises and conduct necessary repairs. AETC Housing insisted that "[t]he work must go forward on Wednesday," and that "if you remain in the home, the work cannot be completed." Ex. K at April 14, 2020 email ¶6.

28.     The Hills continued to refuse access or to leave the premises while the work was done. "You have made a request of us to leave our belongings. This will not occur. There will not

be an intervention that changes the status of us being separated from our belongings." Ex. K at April 14, 2020 email ¶2.

29.     On April 15, 2020, the third scheduled start date for work came and went with the Hills refusing the keys to the hospitality suite so the work could commence. AETC Housing offered more financial and other accommodations, and explained that they could not remain in the home while the repairs were undertaken because the bathrooms would be unusable, the HVAC inoperable, and the kitchen inaccessible. Ex. K at April 15, 2020 email. AETC Housing left a standing offer that it "stands ready to complete the remediation project as outlined by the third party TDLR licensed assessor but can only complete those activities in a manner deemed safe for you and your family." Ex. K at April 15, 2020 email ¶2.

30.     On April 17, 2020, because the Hills continually delayed, deferred and refused access to perform repairs, AETC Housing provided the Hill a 30-Day Notice to Relocate by May 19, 2020.

31.     The Hills vacated the premises on or about May 19, 2020. Under the Lease Agreement, any damage to the Premises not existing prior to the Resident's occupancy exceeding ordinary wear and tear may be charged to the Resident. Paragraph 10, Lease Agreement attached hereto as Exhibit A.

32.     Once vacant, AETC Housing discovered that the mold which had been present during the March AETC Housing inspection was no longer present.





33.     In each of the bathrooms where mold was reported by the Hills and observed by AETC Housing in March and April, the Hills had cleaned and removed the mold when they moved out in May.





34.     In short, there was no mold upon move out (when the Hills thought they might be

charged for it), but substantial mold was allowed to grow when the Hills were preparing their mold

complaints for this lawsuit. This photographic evidence of mold in March/April and no mold May

9695248.8

have been attached to this Counterclaim as Exhibit L. That photographic evidence demonstrates that the mold reported and observed in March could have been removed and cleaned in March, or at any point during the time in which it was allowed to grow unreported, and had likely been present for some time without notice.

<strong>RELEVANT CONTRACTUAL PROVISIONS</strong>

35.     The Mold Addendum, Exhibit 4 to the Lease Agreement, requires Hill to take action to prevent the accumulation of mold:

> Resident acknowledges that it is necessary for Resident to provide appropriate climate control, keep the Premises, clean, and take other measures to retard and prevent mold and mildew from accumulating in the Premises. Resident agrees to clean and dust the Premises on a regular basis and to remove visible moisture on windows, walls and other surfaces as soon as reasonably possible.

Lease Agreement, Ex. A, at Exhibit 4 Mold/Mildew Addendum.

36.     The Lease Agreement and Mold Addendum require prompt notice to AETC Housing of any damage in general, and, in particular, mold-like damage. Paragraph 19 of the Lease Agreement provides: "Resident shall immediately notify Landlord of any damages to the Premises." Lease Agreement, Ex. A at ¶19. If and when Hill discovers mold-like growth, the Mold Addendum requires Hill  "immediately, upon actual knowledge of the condition, report to the Landlord's management office . . . (ii) any evidence of mold-or-mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area." Mold Addendum, Exhibit 4 to Lease Agreement, Ex. A.

37.     The Resident was required to provide AETC Housing access to the Premises to conduct repairs. "Landlord and Landlord's representatives may enter Premises at reasonable times, in order to inspect it, make necessary or agreed repairs . . ." Lease Agreement, Ex. A at ¶21.

9695248.8

38.     Any damage to the Premises itself or any personal injury or property damage to the Resident or others which was caused by the Resident is the responsibility of the Resident. If the condition of, or damage to, the Premises was caused by the Resident, then "Landlord may make the repair and resident will be responsible for the costs." Lease Agreement, Ex. A at ¶19. If the mold present resulted from a breach of the Resident's contractual obligations, then the Mold Addendum further provides that "the Resident shall be responsible for any damage to the Premises and Resident's property as well as personal injury to Resident . . . resulting from Resident's failure to comply with the terms of this Addendum."  Mold Addendum, Exhibit 4 to Lease Agreement, Ex. A.

39.     The failure to abide by these provisions of the Lease Agreement constitute a breach of the Lease Agreement.  Any breach of the Mold Addendum constitutes a "material default" of the Lease Agreement.

**COUNT ONE: BREACH OF CONTRACT**

40.     Hill entered into valid and binding Lease Agreement attached hereto as Exhibit A.

41.     AETC Housing performed its obligations under the Lease Agreement.

42.     Hill breached the Lease Agreement by:

a.   Failing to "take other measures to retard and prevent mold and mildew from accumulating in the Premises" and "remov[ing] visible moisture on windows, walls and other surfaces as soon as reasonably possible," as required by the Mold Addendum;

b.   Failing to provide prompt notice to AETC Housing of any damage in general, and, in particular, mold-like damage, as required by Paragraph 19 of the Lease Agreement and the Mold Addendum;

40

c.   Deferring, delaying and refusing access to the Premises;

d.   Deferring, delaying and refusing AETC Housing's efforts to conduct reasonable and necessary repairs;

e.   Refusing to temporarily locate to Temporary Lodging Facilities ("TLF") at no charge so that necessary repairs could be made safely;

f.   To the extent that the Premises were damaged, causing, creating, and/or failing to prevent conditions and Damages to the Premises;

g.   To the extent Hills' claims for damages were caused by mold in their home (which AETC Housing denies), causing, creating, and/or failing to prevent damages to Hill's own property as well as personal injury to Hill and his family; and

h.   Other conduct to be proven at trial.

43.   AETC has suffered damages as a result of Hill's breach of the Lease Agreement, including but not limited to the cost of repairs, third party contractor costs, costs and fees incurred to request, compel, and ultimately relocate the Hills, any damages to Hill's own property or personal injury found to be caused by exposure to mold in the Premises, attorney fees, court costs, all other damages available under the Lease Agreement, and all other damages proven at trial.

## COUNT TWO: CONTRACTUAL INDEMNITY

44.   Hill entered into a valid Lease Agreement, attached as Exhibit A, which included the Mold Addendum.

45.   AETC Housing performed its obligations under the Lease Agreement and Mold Addendum.

9695248.8

46.     The Mold Addendum clearly provided fair notice that Hill would indemnify AETC Housing for, and be contractually liable and responsible for, any damage or personal injury resulting from Hill's failure to comply with the Mold Addendum. Specifically, the Mold Addendum provides that "the Resident shall be responsible for any damage to the Premises and Resident's property as well as personal injury to Resident . . . resulting from Resident's failure to comply with the terms of this Addendum." Mold Addendum, Exhibit 4 to Lease Agreement, Ex. A.

47.     Hill failed to comply with the Mold Addendum by:

a.  Failing to "take other measures to retard and prevent mold and mildew from accumulating in the Premises" and "remov[ing] visible moisture on windows, walls and other surfaces as soon as reasonably possible," as required by the Mold Addendum;

b.  Failing to provide prompt notice to AETC Housing of any damage in general, and, in particular, mold-like damage, as required by Paragraph 19 of the Lease Agreement and the Mold Addendum;

c.  Deferring, delaying and refusing access to the Premises;

d.  Deferring, delaying and refusing AETC Housing's efforts to conduct reasonable and necessary repairs; and

e.  Other conduct to be proven at trial.

48.     To the extent that there is any damage to the Premises, the Hills' own property (which AETC Housing denies), or personal injury to any member of the Hill family (which AETC Housing also denies), Hill is liable for that damage and must be responsible for and indemnify AETC Housing against any damage found or amounts it is ordered to pay.

9695248.8

WHEREFORE, Defendant AETC II Privatized Housing, LLC respectfully requests that judgment be entered in its favor, and that AETC II Privatized Housing, LLC be awarded its costs, expenses, and such other relief as the Court deems just.

Respectfully submitted this the 17th day of February 2021.

/s/ *Walter H. Boone*

Walter H. Boone, MS Bar No. 8651
(*admitted to W.D. of TX on 7/28/2020*)
Jennifer J. Skipper, State Bar No. 204076171
BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
Jackson, MS 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466
Email: wboone@balch.com
         jskipper@balch.com

Julia W. Mann, Sate Bar No. 00791171
Erica Benites Giese, State Bar No. 24036212
JACKSON WALKER LLP
112 E. Pecan Street, Suite 2400
San Antonio, TX 782015
Telephone: 210-978-7761
Facsimile: 210-242-4646
E-Mail: jmann@jw.com
         egiese@jw.com

***Attorneys for AETC II Privatized Housing, LLC***

9695248.8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of February 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Randall A. Pulman, Esq.
Ryan C. Reed, Esq.
Matthew J. McGowan, Esq.
Sarah Jackson, Donahue, Esq.
PULMAN, CAPPUCIO, & PULLEN, LLP
2161 NW Military Highway, Suite 400
(210) 222-9494 Telephone
(210) 892-1610 Facsimile
E-Mail: rpulman@pulmanlaw.com
        rreed@pulmanlaw.com
        mmcgowan@pulmanlaw.com
        sdonahue@pulmanlaw.com

James R. Moriarty, Esq.
LAW OFFICES OF JAMES R. MORIARTY
4119 Montrose, Suite 250
(713) 528-0700 Telephone
(713) 528-1390 Facsimile
E-Mail: jim@moriarty.com

Francisco Guerra, IV
Jennifer Arlene Neal
Robert E. Brzezinksi
WATTS GUERRA, LLP
Four Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
(210) 477-0500
E-Mail: fguerra@wattsguerra.com
        jneal@wattsguerra.com
        rbrzezinski@wattsguerra.com

                                        */s/ Walter H. Boone*
                                        Walter H. Boone, MS Bar No. 8651
                                        *(Admitted to W.D. of TX on 7/28/2020)*

9695248.8